THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ERIC SMITH, Appellant.

Second Department, December 3, 1984

## APPEARANCES OF COUNSEL

*Flamhaft Levy Kamins Hirsch & Booth* (*Harold L. Levy* and *Stephen Flamhaft* of counsel), for appellant.

*Elizabeth Holtzman, District Attorney* (*Barbara D. Underwood, Michael Gore* and *Jonathan Frank* of counsel), for respondent.

### OPINION OF THE COURT

MANGANO, J.

█ Defendant stands convicted, after a nonjury trial, of the crime of manslaughter in the first degree. On the instant appeal, defendant contends that several prejudicial errors were committed during the trial which require reversal of the judgment of conviction. We agree with the defendant, and therefore reverse the judgment and order a new trial.

I

Defendant's conviction of the crime of manslaughter in the first degree arose out of the fatal beating which was inflicted on his paramour's 15-month-old baby during the early morning hours of January 19, 1980.

The most damaging testimony against defendant was that given, under oath, by the victim's older brother, who was six years old at the time of the incident and eight years old at the time of trial. The witness testified that he saw defendant on the night in question beating the child, hitting her with a belt and "stomping" her with his feet. Prior to the giving of this testimony, the prosecutor conducted a preliminary examination of the witness and elicited, *inter alia,* the following answers:

"Q: Do you know what it means to tell the truth?

"A: No.

"Q: Well, do you know the difference between the truth and a lie?

"A: No * * *

"Q: Elroy, do you know what it means to swear?

"A: Uh-uh.

"Q: What does it mean to swear?

"A: You promise.

"Q: Now, if I were to ask you what the truth is, do you know what the word truth means?

"A: Yes.

"Q: What does the word mean?

"A: Tell the truth.

"Q: And what does that mean?

"A: Tell the truth, if you don't tell a lie.

"Q: Well, when you tell the truth, what are you actually saying?

"A: You say what you saw and what you know.

"Q: And if you promise to tell the truth, if you swear to tell the truth, can you break that promise?

"A: No."

The court then asked the witness several questions and elicited the following answers:

"THE COURT: Do you know what would happen if you didn't tell the truth, if you told a lie?

"THE WITNESS: No.

"THE COURT: Do you know if you would be punished?

"THE WITNESS: No.

"THE COURT: When your mother asks you a question about something that happened, do you always tell her the truth?

"THE WITNESS: Yes.

"THE COURT: Do you what a fib is?

"THE WITNESS: No.

"THE COURT: Do you ever not tell your mother the truth?

"THE WITNESS: No.

"THE COURT: Do you think you would be punished?

"THE WITNESS: Yes."

Upon cross-examination by defense counsel, the following answers were given by the witness:

"Q: Do you know what the word oath means?

"A: No.

"Q: Elroy, if you swore to tell the truth and you didn't tell the truth, do you know what would happen to you?

"A: No.

"Q: Other than your mother or someone else being angry at you, would you expect anything else to happen to you for not telling the truth?

"A: I don't know."

Immediately thereafter, defense counsel objected to having the witness sworn on the ground that he did not understand the nature of the oath. Specifically, defense counsel argued:

"Understanding the nature of an oath is being more than simply knowing the difference between the truth and a lie, and the witness takes an oath to God to tell the truth. The bedrock of that oath is what something very, very serious, whether it be eternal damnation or another great consequence, may happen if one breaks that oath. There has to be an awareness that one is swearing to a supreme being to tell the truth.

"Merely to think that a mother may be angry with you is not sufficient, and I would respectfully submit that this child, does not sufficiently understand the nature of an oath, the nature of the oath and to be bound by such an oath."

The trial court overruled defense counsel's objection and ruled that the witness could be sworn, stating, *inter alia:* "I am satisfied that he understands the nature of the oath, even though he doesn't know the definition of the word oath."

In our view, the trial court erred in swearing this witness. CPL 60.20 (subd 2) provides in pertinent part, that: "A child less than twelve years old may not testify under oath unless the court is satisfied that he understands the nature of an oath." Although a trial court is granted a wide degree of latitude in determining whether to accept the sworn testimony of a child less than 12 years old, it is crucial to note that "under CPL 60.20 (subd 2), a rebuttable presumption exists that an infant less than 12 years old is not competent to be sworn" and that "it must * * * be clear that he knows, understands and appreciates the nature of an oath before the trial court may permit the reception of sworn testimony" (*People v Nisoff,* 36 NY2d 560, 565-566). Viewed within this perspective, the preliminary examination as a whole, in the instant case, did not clearly establish that the witness understood and appreciated the nature of an oath. Accordingly, the court erred in permitting the witness to be sworn and testify under oath.

## II

It was also error for the court to allow another witness to testify, over defense counsel's objection, that sometime in November, 1980, she overheard defendant talking in his sleep

saying "Phyllis [defendant's paramour] I'm sorry. I didn't mean to, you know, kill the baby". The admission of this prejudicial testimony was clearly error "[since] the circumstances in which the statements were purportedly made, in defendant's sleep, severely detract from their reliability" (*People v Knatz,* 76 AD2d 889). Moreover, the error cannot be minimized based on the court's remark that it did not "think highly" of this testimony, since the court also stated that the testimony had "some probative value".

## III

◼ Finally, the trial court committed reversible error when it allowed the prosecution to impeach its own witness, the defendant's son, through the use of his Grand Jury testimony.

The defendant's son advised the court that he did not wish to testify since he did not want the court "to make a decision on the innocence of [his] father" based on any testimony that he might give. After the court advised the witness that any decision in the case would be based on "all the evidence" and not solely on the witness' testimony, the witness testified generally that at the time of the incident, he had been living with defendant and the latter's paramour. The witness testified that he saw someone go into the children's room, but would not say any more, for his "father's sake". The witness persisted in this vein, despite admonitions by the court, on the ground that he might thereby injure his father, the defendant. Finally, over objection of defense counsel, the court ruled that (1) the witness could "only be deemed hostile", and (2) the prosecutor could question the witness "as if it was cross-examination" with regard "to his testimony before the grand jury". The prosecutor then read the following excerpts from the witness' Grand Jury testimony to the witness:

"Question: Could you tell me what happened about 1:30 A.M. on January 19, 1980?

"Answer: Well, my father proceeded into the room next to his room.

"Question: Who was in that room, do you know?

"Answer: The Kids, the baby.

"Question: The four children?

"Answer: Yes * * *

"Question: What happened when your father went into that room?

"Answer: Well, he closed the door, and after a while I heard a stomp and the baby cough. She like let out some air, and after

that he came out, proceeded back into his room and went to sleep.

"Question: Now, when Eric Smith [defendant] went into that room was there anybody else present besides Eric Smith and the four children?

"Answer: No, I don't think so, not anybody.

"Question: Any other person?

"Answer: No."

The witness, in response to inquiry by defense counsel and the court, admitted being asked those questions and giving those answers.

In our view, the trial court allowed the prosecution to impeach its own witness in contravention of CPL 60.35 and thereby committed reversible error. CPL 60.35 provides in subdivision 1 as follows: "1. When, upon examination by the party who called him, a witness in a criminal proceeding gives testimony upon a material issue of the case which tends to disprove the position of such party, such party may introduce evidence that such witness has previously made either a written statement signed by him or an oral statement under oath contradictory to such testimony." The impeachment of the prosecution's own witness in the case at bar was improper because the precondition of CPL 60.35 (subd 1), i.e., that the trial testimony must "tend * * * to disprove" the position of the party calling the witness, was not satisfied. The trial testimony of defendant's son did not, in the words of the Court of Appeals interpreting this statute, *"affirmatively damage"* the case of the party (the People) calling him (*People v Fitzpatrick,* 40 NY2d 44, 51; see, also, *People v Dann,* 100 AD2d 909; *People v Kitchen,* 55 AD2d 575). Although it can be argued that the trial testimony of defendant's son was materially different than the trial testimony of the witness in the *Fitzpatrick* case (where the witness testified that he did not recall the events), this court in *People v Jordan* (59 AD2d 746) specifically rejected such an argument as a basis for allowing impeachment of one's own witness (see, also, *Randazzo v United States,* 300 F 794, 797; *State v Gregory,* 339 Mo 133).

The trial court's declaration that the defendant's son was a hostile witness does not change the result. In *People v Jordan (supra),* this court held that it was error for a trial court to (1) declare a prosecution witness to be hostile and (2) thereby allow impeachment by the prosecutor of that witness through the use of inconsistent statements, when the record indicated that the prosecution was "completely forewarned" that its witness would

not repeat his prior out-of-court statements in the form of trial testimony (see *People v Jordan, supra*). Under those circumstances, this court, in *People v Jordan* (*supra,* p 747), stated: "The prosecution cannot claim surprise and, therefore, the declaration that Brown was a hostile witness was improper."

Professor Wharton, in his treatise (see 2 Wharton, Criminal Evidence [13th ed], § 485), has set forth the rule as follows:

"A party may impeach his own witness because of the witness' adverse or hostile testimony only if it appears that the party was taken by surprise. Such surprise must be bona fide and founded upon an honest belief that the witness' testimony should have been different from that given.

"A party cannot claim to have been surprised by his witness' adverse or hostile testimony when he had failed to make inquiry as to the witness' proposed testimony before calling him to the stand; when he had reason to doubt that the testimony would be favorable; or when he had no reason to believe that it would be favorable. Nor can a party claim to have been surprised when he had been informed by the witness himself that the proposed testimony would not be favorable."

The record herein indicates that immediately prior to the commencement of the trial, a material witness order had to be signed by the trial court due to the prosecutor's statement to the court that defendant's son had indicated to him that very morning that he would not appear. Although the defendant's son subsequently came to court (in response to a subpoena), and the material witness order was thereafter vacated, the prosecution cannot claim bona fide surprise, and, therefore, the declaration that defendant's son was a hostile witness was improper (*People v Jordan, supra; People v Kitchen, supra*). The People cite *People v Ramirez* (66 AD2d 902) as authority for their argument that the Grand Jury statements of defendant's son were properly utilized and that no violation of CPL 60.35 occurred. We disagree. A review of the record in *Ramirez* indicates that it is distinguishable from the case at bar in that (1) in *Ramirez,* two answers, which were given to the Grand Jury by a witness and which did not directly inculpate the defendant, were read to the petit jury without objection by defense counsel. However, the remaining relevant Grand Jury testimony of that witness and all of the relevant Grand Jury testimony of another witness in *Ramirez* were merely shown to those witnesses during the trial as a means of refreshing their recollections (cf. *People v Freeman,* 9 NY2d 600, 604) and (2) after their recollections were refreshed, the witnesses in *Ramirez* both gave trial testimony

(consistent with their Grand Jury testimony) inculpating the defendant. Thus, no impeachment of the prosecution's own witnesses ever occurred during the trial in *Ramirez*.

Accordingly, the judgment of conviction must be reversed, and a new trial granted to the defendant.

MOLLEN, P. J., O'CONNOR and LAWRENCE, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered May 20, 1982, reversed, on the law, and new trial ordered. The questions of fact have been considered and are determined to be established.