(No. 66609.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LEONARD KIDD, Appellant.

*Opinion filed April 16, 1992.*

512

Randolph N. Stone, Public Defender, of Chicago (Richard E. Cunningham, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and David R. Butzen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Defendant, Leonard Kidd, was convicted of 10 counts of murder and one count of arson following a jury trial in the circuit court of Cook County. Prior to trial, defendant attempted to waive a jury for sentencing, but the trial judge refused to accept such waiver. Subsequently, before the same jury which convicted him, defendant was found eligible for the death penalty because he was at least 18 years old at the time of the murders, and because he was convicted of murdering two or more individuals (see Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)). At the second stage of the sentencing hearing, the jury found no mitigating factors sufficient to preclude imposition of the death penalty. The trial court thereafter sentenced defendant to death. The sentence was stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1987, ch. 38, par. 9—1(i); 134 Ill. 2d Rules 603, 605).

On appeal, defendant raises 17 issues, including nine issues pertaining to his sentencing hearing. The State, however, concedes that defendant did not receive a fair death penalty hearing, and that the cause should be remanded for a new hearing. The remaining eight issues relating to defendant's trial are: (1) whether defendant's confession introduced at trial was taken in violation of

his fifth amendment right to counsel; (2) whether the introduction of defendant's "dream" statement denied defendant a fair trial; (3) whether the prosecutor's repeated characterization of the defense as a "smoke screen" was prejudicial error; (4) whether a *corpus delicti* of arson was proven beyond a reasonable doubt; (5) whether the prosecutor's comments on the defendant's failure to call witnesses deprived him of a fair trial; (6) whether the State's repeated arguments of facts not in evidence deprived the defendant a fair trial; (7) whether the prosecutor used an inadmissible lay opinion of guilt to deny the defendant a fair trial; and (8) whether the trial court erred in refusing to accept defendant's pretrial waiver of sentencing jury.

On October 28, 1980, fire caused extensive damage to a two-story, frame, residential building, located at 1512 E. 65th Place in Chicago. While all three apartments on the first floor were vacant, two apartments on the second floor were occupied. Emma Burt resided with her four children in the apartment located on the west side of the building, and Brenda Boyd lived in the apartment located on the east side with her five children. At the time of the fire, Emma Burt's sister, Gertrude Burt, and her five children were present in Emma's apartment. As a result of the fire, 10 children died.

On September 14, 1984, nearly four years after the fire, defendant was interrogated regarding the fire by Chicago Police Sergeant Joseph Murphy, Detectives Richard Kobel and John Robertson, and Assistant State's Attorney James Linn in the State's Attorney's office adjacent to the county jail. At the time, defendant had been held in continuous custody in the jail since his arrest on January 12, 1984, on unrelated murder and arson charges. (See *People v. Kidd* (1989), 129 Ill. 2d 432.) At the time of the interrogation, defendant was represented by Assistant Public Defenders Paul Stralka and

James Stopka on the unrelated matter. In response to questioning, defendant allegedly made incriminating statements regarding his involvement in the fire. Subsequently, defendant was charged by indictment with 32 counts of murder, two counts of aggravated arson, and one count of arson.

At trial, the following testimony was offered. Gertrude Burt testified that during the evening of October 28, 1980, defendant arrived at her sister Emma Burt's apartment to visit Renee Armstrong. Renee was Gertrude's 14-year-old daughter, and defendant's girlfriend. At the time, defendant and Gertrude were alone and defendant asked Gertrude if she smelled anything burning. Gertrude replied "no," and defendant told her that he smelled something burning. According to Gertrude, when she told defendant that she planned to leave that evening to visit defendant's brother, defendant stated not to go because "he felt that something was going to happen." Gertrude testified that she then decided to remain at the apartment.

Gertrude stated that defendant then awakened Renee, who was sleeping in the front of the apartment, and he and Renee asked Gertrude if they could go to McDonald's. Gertrude said "no" because it was too late. At this point, defendant again said that he smelled something burning. Defendant, Renee and Gertrude proceeded down the front stairs to the first floor to the vacant apartment, the "Clay" apartment, located in the rear of the east side of the building. The door to the "Clay" apartment was closed, so defendant "kicked open" the door. Gertrude and Renee followed defendant to a rear bedroom where they found books, paper and an old dresser aflame. After extinguishing this small fire with a tub of water, defendant told Renee and Gertrude to wait there, as he was going to go to the next apartment located to the west of the "Clay" apartment. Ger-

trude testified that defendant "knocked a hole" in the wall dividing the two apartments and proceeded into the adjoining apartment. After "some time," defendant returned to the "Clay" apartment, took a blanket from a rollaway bed, and placed it over the hole in the wall. The three returned upstairs to Emma's apartment, and Renee again asked Gertrude's permission to go to McDonald's. Gertrude acceded to Renee's request this time, and Renee and defendant departed.

Approximately 10 to 15 minutes later, Renee returned to Emma's apartment from McDonald's, but defendant was not with her. Approximately two to three minutes later, defendant entered the apartment and began to eat his food. A short time later, defendant again stated that he smelled something burning. Gertrude replied that she still did not smell anything burning. Defendant then walked to the bathroom in the rear of Emma's apartment, and knocked a hole in a makeshift wall to check the back porch which was not accessible from Emma's apartment. Gertrude stated that she did not see any fire or smoke at this time. Both defendant and Gertrude then entered the kitchen, and defendant opened a cabinet located below the kitchen sink. Smoke came up through the floor. Defendant stated that he was going to go downstairs to investigate. Renee accompanied defendant downstairs, but Gertrude remained at the top of the stairs. Gertrude testified that defendant then yelled upstairs to call the fire department because the building was on fire.

Gertrude stated that she immediately ran to Brenda Boyd's apartment to alert her about the fire, and then back to Emma's apartment to alert the children. Gertrude stated that she managed to save one child by throwing her out the window, and that she was saved by a neighbor.

On cross-examination, Gertrude denied any knowledge of the electricity flickering on and off the night of the fire, or that two of Brenda Boyd's sons had to reset the circuit breakers at the apartment building. In addition, Gertrude agreed that on September 14, 1984, Sergeant Murphy and another police officer came to her home, and Murphy told her that defendant had started the fire. Gertrude further testified that on September 14 she told the police for the first time of defendant's alleged statement on the night of the fire that she should not leave the apartment because "something might happen" and that defendant had kicked a hole in the wall of the "Clay" apartment and covered it with a blanket the night of the fire. Gertrude also admitted that she is "not good with minutes, times" because she could not read or write, but defendant had remained in the west, first-floor apartment for approximately two to three minutes while she and Renee waited in the "Clay" apartment. Lastly, Gertrude admitted that following the fire, defendant lived with her and Renee after his release from the hospital.

Renee Armstrong also testified, and her testimony essentially corroborated Gertrude's regarding the events leading up to the discovery of the fire. Like Gertrude, Renee stated that she did not smell any smoke initially. In addition, Renee stated that when the three of them—defendant, Gertrude and herself—first went downstairs to investigate, defendant went straight to the "Clay" apartment, bypassing the other two vacant apartments on the first floor. Defendant twisted the door knob on the "Clay" apartment, but it was locked, so defendant kicked open the door. Renee testified that all of the apartments on the first floor were locked. According to Renee, after defendant entered the western apartment adjacent to the "Clay" apartment, he remained in there for three to five minutes, and at one point she heard

defendant's voice from the front of the apartment saying that there was no fire in there. Renee stated that she was able to see through the hole in the wall of the "Clay" apartment and that there was no one else in the west apartment besides defendant.

Renee further testified that when she and defendant returned from their 10 to 15 minute trip to McDonald's, as they entered the apartment building, defendant said that he again smelled something burning. Renee stated that she did not smell any smoke, so she went up to Emma's apartment to eat her food. Two minutes later defendant entered Emma's apartment, and told Gertrude that he smelled something burning. Defendant and Gertrude then went to the bathroom in the rear of Emma's apartment, but found nothing burning there. Then, as they entered the kitchen, defendant told Gertrude that there was smoke coming from the kitchen's cabinets. As he opened the cabinets located on the west wall of the apartment building, a large amount of smoke came out. Renee testified that the apartment which was below Emma's apartment was the west apartment, not the "Clay" apartment. In addition, Renee stated that before the smoke came out of the kitchen cabinets, neither she nor Gertrude had noticed any smoke in the "house."

Renee stated that after discovering the smoke, defendant, herself and Gertrude went downstairs. Defendant proceeded "straight" to the western apartment and "kicked open" the door, at which time he was met by a blast of fire. Defendant yelled to Gertrude to call the fire department, but Renee ran to her mother's apartment located two buildings away and called. When she returned, the building was fully on fire and she could not reenter.

Renee testified that a week after the fire, defendant came to live with Gertrude and herself at the Jackson Park Terrace apartments. Defendant had been burned on

his face and hands in the fire. At this time, defendant slept downstairs on the couch and Renee slept upstairs. According to Renee, sometime in April or May of 1981, at about 2 a.m., Renee went downstairs to get a drink of water. Renee stated that she heard defendant "talking," saying "Linda, Dianne, I'm sorry, I didn't mean to do it, I didn't mean to do it, don't hurt me, don't hurt me." Linda and Dianne were Renee's two sisters who had died in the fire. Renee stated that she had previously heard defendant "mumble things," but she could never understand him. This night, though, Renee stated she heard defendant "as clear as day." After hearing these comments, Renee told Gertrude, who then "kicked" defendant out of the apartment.

On cross-examination, Renee acknowledged that in the six years following these alleged "dream" statements, she had never told anyone except her mother about them, until two weeks before trial, when she told the assistant State's Attorney. In addition, Renee stated that when she and defendant were returning from McDonald's the night of the fire, she and defendant saw a man in a beige cap and an army jacket on the 1512 E. 65th Place property (the location of the fire), headed east. Renee testified that, at the time, defendant had stated that he thought the man was "Sneeze," a person in the neighborhood they knew. Renee also testified that on the night of the fire she told the police that she did not get a full view of this individual in the beige cap, and that she really did not know who he was. When asked if she had returned to the scene of the fire from her mother's apartment carrying a rifle, Renee testified that she could not remember because it was "so long ago." Neither could she remember whether she told the police that she was carrying the rifle because she was looking for the man in the beige cap. Contrary to her testimony on direct, Renee stated that upon discovering the more

serious fire in the west apartment on the first floor, defendant opened the door with the knob, he did not "kick" it open.

Renee further acknowledged on cross-examination that when the police came to her home in September 1984, they told her that defendant had started the fire that night. Renee then told the police that upon returning from McDonald's the night of the fire, defendant remained on the first floor for a brief time while she went upstairs to eat her food. Renee could not remember whether she had reported this information to the police in 1980 following the fire, or whether this was the first time in 1984.

Assistant State's Attorney Linn testified regarding the defendant's interrogation on September 14, 1984. At the time of the interrogation, Linn worked in the felony review unit at the State's Attorney's office. Linn stated that, after he advised defendant of his *Miranda* rights, Sergeant Murphy showed defendant photos of the fire victims. At this point, defendant began to tremble and said "I did it ... I did start the fire." Linn and the three police officers, Sergeant Murphy and Detectives Robertson and Kobel, were present for these statements. Linn also stated that before defendant continued his confession, he wanted to tell his mother and grandmother about his involvement in the fire. Consequently, Linn, Robertson and Kobel left the interview room to try to phone defendant's mother and grandmother. After 15 to 20 minutes of unsuccessful attempts, they returned to the interview room. According to Linn, at this time, defendant continued stating that "you guys don't have the picture where I started the fire." Then, defendant stated that he started the fire in a closet which was not depicted in the pictures, and that he started it with old clothing and discarded rags. Linn stated that defendant also said the fire concerned his deceased father, "that

there were some things involving his father" which he wanted to tell his mother about before going into further detail.

Emma Burt testified that she has known defendant and his family since 1974. Defendant's father, Melvin Kidd, owned the apartment building located at 1512 East 65th Place. In 1979, Melvin Kidd died. According to Emma, defendant claimed that he owned the building and often collected the rents. However, after Melvin Kidd died, defendant's sister told Emma not to give defendant the rent anymore.

On the day of the fire, Emma had left for work at 12:30 p.m. Her sister Gertrude and niece Dianne had come over to baby-sit her children. Later that evening when she returned home, she was met by her brother-in-law and Gertrude at the "El" station and was informed about the fire. The next day, Emma went to Billings Hospital to pick up her daughter and visit defendant. Emma testified that she visited defendant and was alone in his hospital room with him. At this time, defendant told Emma that he saved one of her children, Monique, by jumping out of the window with her in his arms. Emma accused defendant of lying because Monique had been found dead in the building. Then, Emma testified that she asked defendant if he had set the fire. Emma did not testify as to defendant's response to her question. When questioned why she had asked defendant whether he had set the fire, Emma responded that defendant had "previously told her that he knew how to set fires without getting people hurt." Emma stated that defendant had told her this "lots of times" since his father's death, but the first time was in the early part of 1980.

Emma also testified to a conversation between defendant and herself approximately two weeks before the fire on the front porch of the apartment building.

According to Emma, "someone from the city" came to the building and put a notice on the door of the building. Defendant tore the notice down, and when Emma asked why defendant had done so before anyone could read it, defendant replied that "soon this building is going to pay off."

Emma also testified that approximately one week after the fire, she again spoke with defendant regarding the fire. Emma was at Gertrude's apartment and had a conversation with defendant in the kitchen. Emma stated that she asked defendant, while they were alone, "if he did it." Defendant responded "if [I] tell [you] what [I] know, could [you] protect [me]," and then walked away. Two weeks later, at a benefit for the victims of the fire, Emma testified that while no one was present she again asked defendant if "he did it." According to Emma, defendant reacted as before, stating "if I tell you what I know, can you protect me."

Upon cross-examination, Emma testified that she told a male police officer "right after the fire" in 1980 that she believed defendant had started the fire. However, Emma could not remember the name of the police officer, or whether he was white, black or Oriental. In addition, Emma stated that while she was at the benefit for the fire victims in 1980, she told her sisters, her brother and "the bigger men" at the benefit that defendant had started the fire. In response to the question of whether any of them had chased defendant out of the benefit, Emma responded that "they said because defendant was hurt himself, they'll see when it come [sic] all out."

Brenda Boyd testified that she moved into 1512 E. 65th Place in the summer of 1979. Shortly thereafter, Brenda had a conversation with defendant in which defendant told her that he would be the owner of the building; that defendant's father Melvin had given him the building. In addition, Brenda testified that on the

afternoon of the fire, at approximately 3:15 p.m., the lights went out in the building. Brenda sent her sons, Ronald and Jerome, down to the basement with a candle to "click the switch back on." Brenda also stated that during the fire, she told her children to escape through the back door of the apartment. Brenda testified that a week prior to the fire, the back door had been nailed shut, but she had told her son to remove the nails, which he did. While her family was escaping during the fire, the lights went out again.

On cross-examination, Brenda testified that the circuit breakers in the building tripped approximately three times on the day of the fire, and that her sons, Ronald and Jerome, were responsible for resetting the circuit breakers.

Detective Ernest Rokosik of the Chicago police department bomb and arson section testified as an expert, over objection, concerning the cause and origin of the fire at 1512 East 65th Place. At the time of trial, September 18, 1987, Rokosik had been assigned to the bomb and arson unit for approximately eight years, and was certified by the State of Illinois as an arson investigator.

Rokosik testified that on October 29, 1980, he visited the building located at 1512 East 65th Place to assist in a determination of the cause and origin of the fire. Rokosik testified that when investigating a fire, he first goes to the area of heaviest fire damage and that, generally, is the "area of origin." At this point, he looks for sources of ignition, which would indicate the cause of the fire. Rokosik explained that "fire travel[s] from the lowest point [of heaviest damage] in an upward and outward motion," resulting in a characteristic "V" pattern. Regarding the fire in this case, Rokosik stated that he first encountered the small fire in the "Clay" apartment. Regarding this fire, Rokosik testified that "[it] had been set by itself, apparently, not in conjunction with the larger

main fire toward the center of the building." In addition, Rokosik stated that he did not find any severe fire damage from this small fire in the "Clay" apartment.

Rokosik testified that upon entering the dining room of the west, first-floor apartment, he observed that it was almost "completely gutted." Further, Rokosik noticed two V-shaped low burn patterns in the dining room of this west apartment. The first V-shaped pattern began in the northwest corner of the west wall in the dining room starting at ground level and travelling upward into the kitchen. The second V-shaped pattern began on the east wall of the dining room in a "makeshift or homemade closet," specifically in the center of the closet. Rokosik stated that because "there was no communication between the two V-shaped patterns," the fire had two points of origin. Accordingly, Rokosik stated that based on a reasonable degree of scientific certainty, the fire had two points of origin: (1) the largest in the closet on the east wall of the west apartment on the first floor, and (2) along the northwest corner of the dining room starting at floor level, traveling upward and into the kitchen area.

Rokosik stated that results from the crime lab indicated that a flammable liquid or accelerant had not been used. Rokosik said his own findings were consistent in that he found no evidence of flammable liquids or accelerants. Moreover, Rokosik testified that he ruled out as a cause of the fire: an electrical outlet near the "makeshift" closet; a radiator near the point of origin in the northwest corner of the dining room; spontaneous combustion, or auto ignition; the fuse box and gas and electric meters in the basement; and the stoves in the first- and second-floor apartments. With regards to the basement, Rokosik stated that "[it] had nothing to do with the fire."

On cross-examination, Rokosik stated that he found no evidence of a "trailer," a device commonly used to spread a fire such as toilet paper or clothing. Also, Rokosik admitted that there might have been a third point of origin for the fire, specifically in the kitchen of the west, first-floor apartment. However, the fire in the kitchen might have "communicated" from the second point of origin in the northwest corner of the dining room. Rokosik agreed that the "cause" of a fire is defined as "that which made the fire result" and that if you cannot determine the cause of the fire, it could be either natural, accidental, or arson. When examining the "makeshift" closet in the dining, Rokosik found no "remnants" like books or a blanket in the closet. In fact, Rokosik admitted that he does not know what was in the closet area prior to the fire. As a result, Rokosik stated that he was unable "to determine what actually lit the material that was in the closet," but it was his opinion that the fire originated, in part, in the closet. When asked if the failure to know what actually ignited the materials in the closet meant that the cause of the fire could not be determined, Rokosik replied that he "had reached an opinion as to what caused the fire." Rokosik explained that he believed the fire was arson because there were two points of origin, and because he found "no normally occurring sources of ignition in or around the closet," or "accidental forms of ignition, such as spontaneous combustion."

Subsequently, on redirect, Rokosik stated that it was his opinion that "some source of heat, such as flame, ignited [the fires]." Rokosik, however, was never asked either on direct or redirect whether he had an opinion within a reasonable degree of scientific certainty what was the "cause" of the fire.

After Rokosik testified, the State rested. The defense, during its case in chief, admitted into evidence a

certified copy of title to the property located at 1512 East 65th Place deeded from Melvin and Clara Ruth Kidd (defendant's parents) to Deborah Renee Kidd and Beverly Ann Kidd (defendant's sisters). The certificate of title was deeded on February 7, 1980. The defense then rested.

Following closing arguments, the jury found defendant guilty of 10 counts of murder and one count of arson. After the verdicts were entered, defendant renewed his objection to the trial court's refusal to accept his pretrial waiver of jury for sentencing. A sentencing hearing followed, and the jury returned a sentence of death.

Defense counsel filed a post-trial motion, which was denied. Defendant also filed a *pro se* post-trial motion, which was also heard and denied. Attached to defendant's *pro se* motion were copies of police reports which included statements from Renee Armstrong and Gertrude Burt taken on October 29, 1980. These statements indicated that both Renee and Gertrude smelled smoke prior to discovery of the fire. In addition, Gertrude's statement indicated that after defendant discovered the fire and was injured, he warned the other occupants to get out and then "went up to the second floor and tried to aid the other occupants in getting out of the building. He then exited the building through a rear window."

The first issue defendant raises on appeal is that his oral confession was obtained in violation of his fifth amendment right to counsel. U.S. Const., amend. V.

As we explained earlier, on September 14, 1984, defendant was interrogated regarding the fire by Chicago Police Sergeant Joseph Murphy, Detectives Richard Kobel and John Robertson, and Assistant State's Attorney James Linn in the State's Attorney's office adjacent to the county jail. In response to this questioning, defendant allegedly admitted to setting the fire.

Prior to trial, defendant filed a motion to suppress his custodial statements. At a hearing on this motion, the following evidence and testimony was elicited. For approximately two or three months following defendant's arrest in January 1984 on the unrelated murder and arson charges (see *People v. Kidd* (1989), 129 Ill. 2d 432), private attorney Earl Washington represented defendant and his step-brother Leroy Orange. Subsequently, Earl Washington withdrew from representing defendant in the spring of 1984 due to a conflict of interest, and Assistant Public Defenders Stralka and Stopka were appointed to represent defendant. After Washington withdrew, Orange indicated to Washington that he believed defendant had been involved in the fire at issue in this case. Thereafter, Washington contacted the State's Attorney's office and related this information, prompting the State's Attorney's office to interrogate defendant.

On September 14, 1984, at approximately 10 a.m., defendant was brought from the Cook County jail to the adjacent State's Attorney's office for questioning. Neither a stenographer nor a court reporter was present. Linn testified that before he arrived for the interrogation, Murphy gave defendant *Miranda* warnings in the presence of the two detectives, and defendant stated that he understood those rights. According to Linn, when he arrived, he also gave defendant *Miranda* warnings, and defendant acknowledged that he understood those rights. Linn also stated that he told defendant that he was an assistant State's Attorney, and as such he was a lawyer for the police and not for defendant. Kobel and Robertson testified similarly.

According to the State, during the questioning, defendant recounted the events of the fire, but denied any responsibility for setting it. Sergeant Murphy then showed defendant photographs of the 10 deceased vic-

tims of the fire, and photographs of the building after the fire. Defendant became somber, and stated that he wished to tell "his true involvement in setting the fire." However, defendant stated that before giving them a detailed account, he wanted to speak with his mother and grandmother so that they would learn of his involvement in the fire from him and not someone else. Linn, Kobel, and Robertson then left the room and attempted to call defendant's mother and grandmother. Murphy testified that he remained with defendant, and that he neither made promises or threats to defendant, nor pointed his gun at defendant to induce him to speak. On cross-examination, Murphy testified that while Linn, Kobel and Robertson were out of the room, defendant initiated further conversation with him by asking him questions.

Linn testified that after approximately 15 to 20 minutes, he, Kobel, and Robertson returned to the room, after being unable to initially contact defendant's mother and grandmother. The authorities' conversation with defendant continued for a short while and, eventually, defendant was able to contact his mother and grandmother by phone. According to the State's witnesses, defendant never requested counsel, nor did he ask his mother to obtain a lawyer for him. Subsequently, defendant was returned to the Cook County jail.

Defendant's attorney, Paul Stralka, testified that at approximately 11 a.m., on September 14, 1984, he and and Assistant Public Defender Jim Stopka went to the Cook County jail to visit with defendant. However, upon arriving at the jail, he learned that defendant was at the State's Attorney's office. He and Stopka proceeded to the 14th floor of that office. Stralka testified that when he arrived at the 14th floor, he asked to see the prosecutors assigned to defendant's case in the unrelated matter, but was told by the receptionist they were in conference. In response to Stralka's question of whether

defendant was also present, the receptionist stated that she did not have "any information." After waiting a few minutes, Stralka and Stopka left the State's Attorney's office. Stralka testified that he was never informed on September 14, 1984, by anyone from the State's Attorney's office that defendant was present on the 14th floor. Assistant State's Attorney Linn also testified that he was never informed during defendant's questioning that Stralka and Stopka were present at the office and that they wished to see defendant.

Earl Washington also testified as a defense witness. As noted earlier, Washington had represented defendant and his step-brother Leroy Orange on an unrelated matter in January 1984. Subsequently, Washington withdrew from representing defendant in the spring of 1984 due to a conflict of interest. Thereafter, Orange indicated to Washington that he believed defendant had been involved in the fire at issue in this case. Washington testified that during the two to three months he represented defendant in early 1984, he never discussed the fire at issue here with defendant. Moreover, Washington stated that Orange wanted Washington to inform the State's Attorney of defendant's involvement in this fire to bolster his own position in the unrelated matter.

Clara Kidd, defendant's mother, testified that on September 14, 1984, defendant called her and said, "I want you to get me a lawyer." Clara responded stating that she was at work, that she did not have the time to talk, and to call her at home. Later that evening, the police brought Clara from her home to the State's Attorney's office to speak with defendant. However, after waiting for over two hours, Clara was told that defendant did not want to come over from the jail and speak with her. Clara also testified that prior to this motion to suppress, she had never told the police that defendant had requested a lawyer on September 14, 1984.

Lastly, defendant testified. Defendant stated that after initially being questioned for approximately 5 to 10 minutes on the 14th floor of the State's Attorney's office, Linn, Kobel, and Robertson left the room. At this time defendant was alone with Sergeant Murphy, who then pulled out the aforementioned photos of the victims, laid his gun on the table pointing it directly at defendant, and told defendant he knew something about the fire. Defendant told Murphy that he almost lost his life trying to save people in the fire, that he had nothing to say, and that he wanted a lawyer present. According to defendant, Murphy responded by stating that defendant had no right to have a lawyer present during questioning, and that Murphy then stuck his gun in defendant's stomach and told defendant he was going to make a statement. After Linn, Kobel and Robertson returned to the room, defendant was permitted to call his mother. Defendant stated that he told her to "get me a lawyer. They got me down here trying to hook me up with another case." Defendant also maintained that he was never advised of his *Miranda* rights while he was being questioned, and that he never made any incriminating statements during the interview.

At the close of evidence and argument, the trial court denied defendant's motion to suppress, stating that "the [*Miranda*] rights were given, and the rights were freely and knowingly and intelligently waived." The trial court resolved all credibility questions in favor of the State, and concluded that under a totality of the circumstances analysis, none of defendant's constitutional rights were violated.

Subsequently, defendant filed a motion to reconsider the motion to suppress statements, limited to a fifth amendment violation claim. The trial court denied defendant's motion to reconsider, expressly relying on *People v. Martin* (1984), 102 Ill. 2d 412, while declining

to follow *United States ex rel. Espinoza v. Fairman* (7th Cir. 1987), 813 F.2d 117, as urged by defendant. In discussing the application of these cases, the trial court stated:

"Whatever number of the constitutional amendments you might choose to apply, the facts are still the same. The constitutional rights of the defendant-petitioner are still the same. They call it the Fifth Amendment or the Sixth Amendment."

The resolution of this issue is relatively straightforward in light of the Supreme Court's recent decision in *McNeil v. Wisconsin* (1991), 501 U.S. ___, 115 L. Ed. 2d 158, 111 S. Ct. 2204, and our recent decision in *People v. Perry* (1992), 147 Ill. 2d 430. In *McNeil*, the Supreme Court held that a defendant's invocation of his sixth amendment right to counsel during a judicial proceeding as to one offense does not constitute the invocation of a defendant's fifth amendment right to counsel under *Miranda* as to uncharged offenses. (See *McNeil*, 501 U.S. at ___, 115 L. Ed. 2d at 168-71, 111 S. Ct. at 2208-11.) Subsequently, in *Perry*, we adopted and applied the legal reasoning from *McNeil* to the facts of that case. In addition, we declined to read our State constitutional privilege against self-incrimination (Ill. Const. 1970, art. I, §10) more broadly than its Federal counterpart.

Presently, defendant argues only that the police-initiated interrogation on September 14, 1984, violated his Federal constitutional rights under the fifth amendment. Defendant does not make a State constitutional claim under article I, section 10. Nonetheless, we find that the facts of this case are on all fours with *McNeil* and, consequently, *McNeil* is dispositive of defendant's motion to suppress his custodial statements. In *McNeil*, the defendant's sixth amendment right to counsel attached when a public defender appeared on the defendant's behalf at a

bail hearing regarding a charge of armed robbery. Subsequently, while being held in jail, the police initiated further questioning of the defendant regarding an unrelated murder charge, and the defendant made incriminating statements. Prior to trial, the defendant filed a motion to suppress his incriminating statements, which motion was denied. Defendant appealed arguing that his courtroom appearance with an attorney on the armed robbery charge constituted an invocation of his *Miranda-Edwards* fifth amendment right to counsel, and that any subsequent waiver of that right during police-initiated questioning regarding any offense was invalid. (*McNeil*, 501 U.S. at ___, 115 L. Ed. 2d at 166, 111 S. Ct. at 2207.) As noted above, the Court in *McNeil* held that the invocation of the sixth amendment right to counsel during a judicial proceeding does not constitute an invocation of the fifth amendment right under *Miranda*.

In this case, although defendant's sixth amendment right to counsel attached when private attorney Earl Washington represented defendant at his arraignment on February 7, 1984, on the unrelated murder and arson charges, defendant's fifth amendment right to counsel pursuant to *Miranda* clearly did not arise at that point. (See *McNeil*, 501 U.S. ___, 115 L. Ed. 2d 158, 111 S. Ct. 2204.) As stated in *McNeil*, "[t]o invoke the Sixth Amendment interest is, as a matter of *fact, not* to invoke the *Miranda-Edwards* interest." (Emphasis in original.) (*McNeil*, 501 U.S. at ___, 115 L. Ed. 2d at 168, 111 S. Ct. at 2209.) Thus, the police-initiated interrogation on September 14, 1984, regarding the murder and arson charges at issue here did not violate defendant's fifth amendment right to counsel.

Moreover, defendant's attempt to distinguish *McNeil* on the facts is not persuasive. Essentially, defendant argues that he invoked his fifth amendment right to counsel for the purposes of custodial interrogation when he

retained, prior to his arraignment in February 1984, private attorney Earl Washington in January 1984. According to defendant, because he was represented by Washington and Assistant Public Defenders Stopka and Stralka for eight months prior to the interrogation in September 1984, he clearly "had expressed his desire to deal with the authorities only through counsel." We disagree. As *McNeil* clearly sets forth, to invoke the *Miranda-Edwards* interest, there must be "at a minimum, some statement that can reasonably be construed to be [an] expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" (Emphasis in original.) (*McNeil*, 501 U.S. at ____, 115 L. Ed. 2d at 169, 111 S. Ct. at 2209.) There is no evidence of such a statement here, and consequently, defendant's attempt to distinguish *McNeil* fails.

Next, defendant argues that the introduction of inherently unreliable dream statements denied him a fair trial. The facts pertaining to this issue are as follows.

Approximately 10 days before trial, in the course of fulfilling its discovery obligations, the State told the trial court and defense counsel that Renee Armstrong, defendant's former girlfriend, had recently informed them that defendant made certain "dream" statements which the State wished to introduce at trial. The trial court ordered the State to provide defense counsel with a written summary of the statements which would establish a basic foundation. In addition, the trial court ordered the State to make Renee Armstrong available for an interview since she had never revealed this evidence to the State or defense counsel in the approximately 6½ years since the statements.

Subsequently, defense counsel filed a motion *in limine* to bar Renee from testifying as to any "dreams, utterances, conversations, or ramblings allegedly made by [defendant] to Renee Armstrong, which are allegedly

self-incriminating." Defendant argued that these statements were inherently unreliable because defendant was asleep when the statements were made, that they were incapable of being rebutted, and that no proper foundation had been laid for their introduction. The State, on the other hand, argued that there was no evidence of whether these statements were the product of a dream or nightmare, and that they were shown to be admissible "utterances." At the hearing on the motion, the trial court did not make a determination as to whether the statements were made while defendant was awake or asleep. The trial court subsequently denied defendant's motion *in limine*, stating:

> "I do not think that these kinds of statements are quote, inherently untrustworthy and not probative. *I think that would be up to the jury to decide whether they are trustworthy or probative or not.* There is no case that says they should not be admitted, and in light of the fact that there is nothing in the law to prevent this, and logic does not dictate that they are inherently untrustworthy, I believe they cross the threshold of admissibility and then become simply a matter of how the jury would consider them." (Emphasis added.)

The trial court also determined that "there is at least a fairly general notion of the time period" of the statements sufficient to cure any potential due process or right of confrontation problems. Moreover, the trial court compared defendant's "dream" statements with those in *People v. Linscott* (1986), 114 Ill. 2d 340, and *People v. Columbo* (1983), 118 Ill. App. 3d 882, and stated that *"there is a distinction but I don't see it to be a distinction with a substantial difference."* (Emphasis added.) Thus, the trial court ruled that the jury should "assess and evaluate the quality of this kind of evidence."

As a preliminary matter, we note that evidentiary rulings in criminal trials are within the sound discretion of the trial court, and such rulings will not be reversed absent a clear abuse of discretion. (See *People v. Hayes* (1990), 139 Ill. 2d 89, 130.) In this instance, however, we find that the trial court clearly erred in its analysis of whether this evidence should be admitted. The trial court stated that it is up "to the jury to decide whether [these statements] are *trustworthy or probative or not*." (Emphasis added.) This is not the province of the jury. The trial judge must determine whether evidence is probative and reliable, whereas the jury determines weight and credibility. (See *Hayes*, 139 Ill. 2d at 130 (stating that it is within the discretion of the trial court to decide whether evidence is relevant and admissible).) Moreover, it is apparent from the trial judge's favorable comparison of the dream statements in this case with those in *Linscott* and *Columbo*, in which the defendants actually recounted their "dreams" to the police, that he misconstrued this evidence. Here, defendant not only did not recount his "dream" to the police, but he has consistently denied ever making these "dream" statements.

On appeal, defendant argues that the introduction of these "dream" statements violated due process and the right of confrontation (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §2). Defendant maintains that although the issue of whether statements made by a defendant during a dream are admissible against him is one of first impression in Illinois, other States have concluded that such evidence is not admissible. (See *State v. White* (1967), 271 N.C. 391, 156 S.E.2d 721.) Moreover, defendant contends that even if such evidence is admissible under certain circumstances, in this case, the indicia of reliability and foundation laid for defendant's "dream" statements was so weak that this evidence should have been excluded.

The State, on the other hand, argues that the evidence is conflicting as to whether defendant was asleep or awake when Renee heard defendant utter these statements. Since defendant might have been awake at the time, the State argues that the trial judge properly determined that the statements were not inherently untrustworthy and that the jury should decide the weight to be given these statements.

Defendant is correct in observing that Illinois courts have never addressed the issue of whether statements made by a defendant during a dream are admissible against him. However, courts from other jurisdictions have addressed this issue, and their decisions are split in terms of the admissibility of such dream statements. (See Annot., *Admissibility of Evidence Concerning Words Spoken While Declarant Was Asleep or Unconscious*, 14 A.L.R.4th 802 (1982 & Supp. 1991).) Courts which have found such dream statements inadmissible reason that they lack a sufficient indicia of reliability. (See *People v. Robinson* (1861), 19 Cal. 40, 41; *Martinez v. People* (1913), 55 Colo. 51, 52-53, 132 P. 64, 64-65; *Godfrey v. State* (1988), 258 Ga. 28, 365 S.E.2d 93; *State v. Rocker* (1908), 138 Iowa 653, 657, 116 N.W. 797, 800; *People v. Knatz* (1980), 76 A.D.2d 889, 889, 428 N.Y.S.2d 709, 711; *People v. Smith* (1984), 104 A.D.2d 160, 164, 481 N.Y.S.2d 879, 881; *Plummer v. Ricker* (1898), 71 Vt. 114, 41 A. 1045.) In *Plummer v. Ricker* (1898), 71 Vt. 114, 117, 41 A. 1045, 1046, the court stated:

> "Words spoken while in sleep are not evidence of a fact or condition of mind. They proceed from an unconscious and irresponsible condition; they have little or no meaning; they are as likely to refer to unreal facts or conditions as to things real; they are wholly unreliable; and a jury ought not to be allowed to guess that such expres-

sions are produced by a present mental or physical condition."

Other courts have condemned the use of dream statements, without addressing the precise issue of admissibility. (See *Gough v. General Box Co.* (Mo. 1957), 302 S.W.2d 884, 890 (victim was unconscious, not sleeping, when making statements; statements held inadmissible); *Johnson v. Southern Ry. Co.* (Mo. 1943), 175 S.W.2d 802, 805-06 (victim was unconscious, not sleeping, when making statements; statements held admissible).) Still other courts have held that if it is unclear whether the declarant was asleep or awake, the statements are admissible and the jury should decide the issue. See *Sutton v. State* (1976), 237 Ga. 418, 228 S.E.2d 815 (evidence showed defendant was in drunken stupor or asleep and was conflicting as to whether defendant was conscious or unconscious); *Martinez*, 55 Colo. at 56, 132 P. at 66 (if the accused was asleep, statements are not admissible, but "[w]here there is a question of whether the accused was conscious or unconscious when he spoke, it should be left to the jury under proper instructions"); *Rocker*, 138 Iowa at 657, 116 N.W. at 800 (if accused was asleep and unconscious, statements "might not properly be received in evidence"); *State v. Morgan* (1891), 35 W. Va. 260, 265, 13 S.E. 385, 386.

We find that we are in agreement with those jurisdictions cited above which not only condemn the use of statements made during a dream, but also those that hold such evidence should not be admissible. As stated by the North Carolina Supreme Court, "[w]hat a dream means, if anything, presents an occurrence filled with mystery. As to the meaning of a dream, we can only conjecture." (*State v. White* (1967), 271 N.C. 391, 394-95, 156 S.E.2d 721, 724.) While we do not doubt that dreams may in some respect relate to real experiences, their real meaning is open to a variety of interpreta-

tions. Dreams are imaginings and fantasy, and involve little logical thought. Furthermore, we are not aware of any scientific agreement, at present, that dreams can be explained in purely psychological, rather than physiological, terms. (See J. Hobson, The Dreaming Brain (1988); M. Steriade & R. McCarley, Brainstem Control of Wakefulness and Sleep (1990).) Consequently, we hold that statements made by a declarant while asleep, and offered as admissions, do not carry the necessary indicia of trustworthiness required of competent evidence and are inadmissible.

While this type of evidence may be relevant (*i.e.*, it definitely has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence (see *People v. Boclair* (1989), 129 Ill. 2d 458, 477)), it is not reliable and trustworthy. Analogous to our holding here is this court's discussion in *People v. Zayas* (1989), 131 Ill. 2d 284, regarding the admissibility of hypnotically enhanced testimony. In *Zayas*, the court held that hypnotically induced testimony is not admissible because its reliability is suspect. There, the court stated:

> "The fact that information elicited through hypnosis can be corroborated, moreover, does not permit a court to admit it as evidence. *We are not concerned with whether evidence is plausible but, rather, whether evidence is reliable.*" (Emphasis added.) (*Zayas*, 131 Ill. 2d at 295.)

These comments from *Zayas* are equally applicable to this case.

Given our determination that statements made during a dream our inadmissible, we turn to the facts of this case. The State argues that the evidence is conflicting as to whether defendant was asleep or awake when Renee heard defendant utter these statements. Since defendant may have been awake, the State contends that the jury

should decide the issue and the weight to be given these statements. We disagree. It is clear that the evidence concerning defendant's state of mind at the time of the alleged statements is conflicting. On the one hand, all the surrounding circumstances point to the fact that defendant was sleeping. It was 2 a.m.; defendant was on the couch where he normally slept; Renee neither verbally nor physically confronted defendant after hearing the statements; and apparently, neither Renee nor defendant acknowledged the presence of the other person. On the other hand, Renee's testimony at trial offered no indication of whether defendant was in fact asleep. At the hearing on defendant's motion *in limine*, no factual determination was made as to whether defendant was awake or asleep.

We believe that the trial judge must make an initial factual determination regarding the admissibility of this evidence. That determination must, in part, consist of whether these statements were made while the declarant was asleep. For, given our holding today, if the declarant was asleep, the statements would not be trustworthy or reliable, and thus they would be inadmissible. We hold that in situations where the evidence is contradictory regarding whether the declarant is awake or asleep, the trial judge must make a preliminary finding of fact that the defendant was awake for the statements to be admissible. In making its determination, the trial court should apply the burden of persuasion of more probably true than not true. (See *Lego v. Twomey* (1972), 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §104.1, at 35 (5th ed. 1990).) Otherwise, we would be asking the jury to first determine whether defendant was asleep at the time of these statements, and if the answer to that question is "yes," asking the jury to disregard such statements as being unreliable. This, we find, would be inap-

propriate and quite confusing for the jury. "It is somewhat like telling a little boy to go to the corner and not think of elephants." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §104.1, at 35 (5th ed. 1990).) Statements which this court has deemed potentially unreliable and untrustworthy should not be put before a jury before a determination is made based on all the available facts.

Consequently, we must remand this cause to the trial court for a factual determination as to whether defendant was sleeping at the time of these alleged statements. If, based on all the evidence available, the trial judge concludes that it is more probably true than not true that defendant was sleeping, then he must exclude these "dream" statements from defendant's trial. If the trial judge determines that it is more probably true than not true that defendant was awake at the time of these alleged statements, then they are admissible and the jury would decide the weight to be given them.

Next, defendant argues that the prosecutor's rebuttal closing argument represented a flagrantly improper disparagement of the defense and defense counsel which deprived defendant of a fair trial and due process of law. Specifically, defendant points to the following comments as improper:

> "There is nothing [defense counsel] can do to change the facts. The facts that you heard from the witness stand during the course of this three or four day trial and as much as [defense counsel] stands here in his argument and *attempts to twist the facts*, add new statements." (Emphasis added.)

After this comment implying that defense counsel was "twisting the facts," defense counsel objected, and the trial judge sustained the objection as to "twist the facts." Subsequently, the prosecutor commented:

"In reality, ladies and gentlemen, the defense attorneys in this case, the real defense is to create as much side issues, to create as much confusion as possible so that when you go into the jury room, you are diverted from the real facts, the real issues *** and you chase after all these loose ends or side issues or side defenses that [defense counsel] just tried to raise in his closing argument.

*I submit to you, ladies and gentlemen, that the defenses raised in this case are similar to a smoke screen.*

*Just as [defendant] filled this apartment building with smoke on October 28, 1980, the defense in this case is trying to fill this courtroom with smoke today.*

*Just as though those ten children ran around lost in the smoke on October 28, 1980, in that building the defense is hoping you will go in the jury room and get lost in the smoke.*

*Ladies and gentlemen, just as the smoke in this building on October 28, 1980, strangled the life out of ten children, the defense is hoping that the smoke that he raises in this room today will strangle the truth."* (Emphasis added.)

After each of these statements by the prosecutor analogizing the defense's case to a "smoke screen," defense counsel objected, and the trial judge overruled the objections. Then, before finishing his rebuttal, the prosecutor managed to return twice more to his "smoke screen" theme:

"Who knows why criminals murder, who knows why Richard Speck did what he did.

*I can't tell you why, so while the defense is throwing out their puffs of smoke trying to divert you,* your attention, that's exactly what they're doing, they're trying to divert your attention from the real issues that you must decide beyond a reasonable doubt.

\* \* \*

\*\*\* [W]hen you use your common sense and you waive [sic] the evidence, ladies and gentlemen, and *you*

*cut through the smoke in this case, its been raised by the defense,* get to the issues in this the case \*\*\*.

And when you do that, there is only one conclusion that you folks can reach, it's going to be up to each of you twelve people to hold [defendant] responsible, finally hold him responsible for his actions. Ladies and gentlemen, find [defendant] guilty." (Emphasis added.)

Again, defense counsel objected for the record to the prosecutor's statements comparing the defense to "puffs of smoke" and that the jury should "cut through the smoke" raised by the defense. Each objection was overruled by the trial judge.

"[S]tatements made in closing arguments by the prosecutor which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper." (*People v. Emerson* (1983), 97 Ill. 2d 487, 497.) Moreover, "[w]here a prosecutor's statements in summation are not relevant to the defendant's guilt or innocence and can only serve to inflame the jury, the statements constitute error." (*People v. Caballero* (1989), 126 Ill. 2d 248, 271; *People v. Tiller* (1982), 94 Ill. 2d 303, 321; *People v. Smothers* (1973), 55 Ill. 2d 172, 176.) "Improper remarks will not merit reversal unless they result in substantial prejudice to the defendant, considering the context of the language used, its relationship to the evidence, and its effect on the defendant's rights to a fair and impartial trial." *People v. Smith* (1990), 141 Ill. 2d 40, 60; see also *Caballero*, 126 Ill. 2d at 273.

It is abundantly clear that the prosecutor's comments comparing or analogizing the defense counsel's argument to a "smoke screen" were improper. This court and our appellate court have on numerous occasions condemned such comments. See *People v. Emerson* (1983), 97 Ill. 2d 487, 497 (during final argument, prosecutor stated to the jury that defense counsel had laid down "smokescreen

'composed of lies and misrepresentations and innuendos' "); *People v. Palmer* (1970), 47 Ill. 2d 289, 299-300 (prosecutor's statements that defense counsel was trying to raise a "smokescreen" were improper); *People v. Burnett* (1963), 27 Ill. 2d 510, 517-18 (prosecutor's comments, that defense counsel was "throw[ing] up a smoke screen to confuse the jury," were "unprofessional and highly improper"); *People v. Thomas* (1990), 199 Ill. App. 3d 79, 100-01 (prosecutor's reference to the defense as a "smoke screen" was improper and better left unsaid); *People v. Suane* (1987), 164 Ill. App. 3d 997, 1004 (prosecutor commented that defense counsel tried "to 'throw a smoke screen' "); *People v. Williams* (1984), 127 Ill. App. 3d 231, 234 (remarks such as "smoke screen" and "veil of smoke" are improper and better left unsaid); *People v. Young* (1981), 97 Ill. App. 3d 319, 325-26 (prosecutor's remarks that defense counsel produced a "smoke screen defense" and that the defense case was "a one-act play based on a 'nicely written script' " were improper); *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 324 (prosecutor's characterization of defense counsel's argument as "smokescreen" and "snowjob" are not to be condoned).

Despite the numerous cases from the courts of this State which have condemned the comparison of a defense counsel's argument to a "smoke screen," the State does not even acknowledge at a minimum that such comments were inappropriate. Instead, the State argues in its brief that the assistant State's Attorney's comments should not be construed as accusing defense counsel of lying or misrepresenting facts, but rather "the gist" of the comments was that "defense counsel was attempting to confuse the jury or obscure the evidence." This, argues the State, is proper.

We believe that the assistant State's Attorney's comments were highly inappropriate and extremely prejudi-

cial for two reasons. First, the assistant State's Attorney did not make just one fleeting, inadvertent remark regarding this "smoke screen" metaphor. Rather, he commented *eight times* that defense counsel was "raising a smoke screen," or "filling this courtroom with smoke today," or "hoping that the smoke he raises in this room today will strangle the truth like it strangled the life of the ten children," etc. Thus, this case is unlike other cases in which the prosecutor made only a passing reference to a "smoke screen" theme, and it was held not to be reversible error. (See *Palmer*, 47 Ill. 2d at 301; *Burnett*, 27 Ill. 2d at 518; *Weatherspoon*, 63 Ill. App. 3d at 324.) Second, given that this was an arson case—10 children perished in fire which defendant is accused of starting—we believe that by repeatedly returning to his "smoke screen" theme and making statements that defense counsel is "hoping that just as those ten children got lost in the smoke, [the jurors] get lost in the smoke," the assistant State's Attorney only inflamed the prejudices of the already emotionally charged jurors. To say that the assistant State's Attorney did not attempt to imply to the jurors that defense counsel " 'attempted to free his client through trickery or deception' " (see *People v. Hope* (1990), 137 Ill. 2d 430, 491, quoting *Emerson*, 97 Ill. 2d at 497) would be a gross misstatement.

In addition, we find that the trial judge only exacerbated the harm by repeatedly overruling defense counsel's objections to these comments. As in *People v. Emerson*, in which this court reversed the defendant's convictions for murder due to improper statements by the prosecutor during closing argument, the assistant State's Attorney's comments "improperly shift[ed] the focus of attention from the evidence in the case to the objectives of trial counsel." (*Emerson*, 97 Ill. 2d at 498.) While we do not determine whether standing alone these highly improper comments would justify reversal of

defendant's convictions and a new trial, we are convinced that this error in conjunction with other errors made at defendant's trial require reversal.

Next, defendant argues that the trial court erred in, one, refusing to accept his pretrial waiver of jury for sentencing, and, two, thereafter permitting the State to question prospective jurors regarding their views on the death penalty. (See *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.) As a result of these two errors, defendant argues that the State violated the rule of *People v. Erickson* (1987), 117 Ill. 2d 271, and *Daley v. Hett* (1986), 113 Ill. 2d 75, and as well as defendant's right to due process of law. The State, on the other hand, acknowledges that the trial court erred in refusing to accept defendant's pretrial waiver of jury for sentencing. Nonetheless, the State maintains that this error does not mandate a finding that defendant was denied a fair trial when the prosecutor death-qualified the jury.

The development of the rule that the trial court has a statutory obligation to accept a knowing and voluntary pretrial waiver of a jury for sentencing, and also prohibit the State from death-qualifying prospective jurors if such a pretrial waiver occurs, has been quite confusing. Initially, in *Daley v. Hett,* this court held that a trial judge has the authority to accept a defendant's pretrial waiver of a jury for purposes of a later death penalty hearing. (*Hett,* 113 Ill. 2d at 82.) Moreover, this court concluded that the State's right to question prospective jurors as to their views regarding the imposition of the death penalty as provided under *Witherspoon "does not come into effect where, as here, the juries that consider the issue of guilt will not consider eligibility for the death penalty."* (Emphasis added.) *Hett,* 113 Ill. 2d at 82.

Subsequently, in *People v. Erickson* (1987), 117 Ill. 2d 271, this court reasoned that in *Hett,* the court only determined that the trial court is *statutorily empowered* to accept a capital defendant's pretrial waiver of a sentencing jury, not whether the trial court is *required* to accept a voluntary and knowing pretrial waiver. (*Erickson,* 117 Ill. 2d at 287.) As a result, *Erickson* held that "where a pretrial waiver of the sentencing jury is tendered and the court ascertains that it is voluntary and knowing, *it must be accepted.*" (Emphasis added.) *Erickson,* 117 Ill. 2d at 288.

In addition, this court stated that the propriety of death-qualifying a jury which has been waived for sentencing was not decided in *Hett,* despite the language quoted above that the State's right "under *Witherspoon* does not come into effect where, as here, the juries that consider the issue of guilt will not consider eligibility of the death penalty." (*Hett,* 113 Ill. 2d at 82.) The majority opinion in *Erickson* thereafter added a caveat, stating "even if *Hett* were read to prohibit death-penalty questioning of prospective jurors where the sentencing jury is waived prior to trial, it would not apply retroactively to defendant's case." *Erickson,* 117 Ill. 2d at 288.

This court's opinions after *Hett* and *Erickson* did not clarify the issue involved here, and more importantly are distinguishable from the case at bar. (See *People v. Shum* (1987), 117 Ill. 2d 317; *People v. Boclair* (1989), 129 Ill. 2d 458; *People v. Harris* (1989), 132 Ill. 2d 366; see also *People v. Lucas* (1989), 132 Ill. 2d 399 (applying the holding in *Hett,* 113 Ill. 2d at 82, that "the State's right to question prospective jurors as to their views regarding the imposition of the death penalty as provided under *Witherspoon* does not come into effect when a defendant waives jury sentencing prior to trial").) A brief review of these cases following *Hett* and *Erickson,* *i.e., Shum, Boclair,* and *Harris,* indicates that they hold

that if the instant case was pending on direct review at the time of this court's decision in *Hett*, June 20, 1986, *Hett* can have no application. However, in this case, the retroactivity of *Hett* is not at issue, and thus the rules set out in *Hett* and *Erickson* applied to defendant's case. Defendant's trial began on September 15, 1987, 15 months after the decision in *Hett* and five months after *Erickson*. Thus, at the time of defendant's trial, defendant not only had the right to waive prior to trial a jury for sentencing (see *Erickson*, 117 Ill. 2d at 288; *Hett*, 113 Ill. 2d at 82), but also had the right to prohibit the death penalty questioning of prospective jurors. See *Erickson*, 117 Ill. 2d at 288; *Hett*, 113 Ill. 2d at 82.

The State does not deny that the trial court erred in refusing to accept defendant's pretrial waiver of a jury for sentencing, only that defendant was not prejudiced because the prospective jurors were death-qualified. Although in *Erickson, Shum* and *Boclair* this court stated in *dicta* that "even where a defendant waives a jury at the sentencing phase, \*\*\* a jury that is questioned about the death penalty is still presumed to be a fair jury on the issue of guilt or innocence" (see *Boclair*, 129 Ill. 2d at 483; *Shum*, 117 Ill. 2d at 339; *Erickson*, 117 Ill. 2d at 292), we believe that based on this error and the other errors in this case, *i.e.,* the admission of defendant's "dream" statement and the assistant State's Attorney's "smoke screen" comments during rebuttal, defendant deserves a new trial. There is no justification for death-qualifying a jury which has nothing to do with sentencing.

For the foregoing reasons, the defendant's convictions are reversed and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*