■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LAWRENCE MUDD, Appellant.—Judgment of the Supreme Court, Bronx County (Lawrence J. Tonetti, J.), rendered January 2, 1991, convicting defendant, after jury trial, of two counts of sodomy in the first degree, and sentencing him to concurrent terms of imprisonment of from 5 to 15 years, unanimously reversed, on the law, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of a copy of this Court's order upon the respondent, with leave during this 30 day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

On this appeal, defendant contends that the court conducted an inadequate voir dire of the complaining witness, improp-

erly receiving her sworn testimony, that the verdict is against the weight of the evidence and that the prosecutor committed misconduct on summation.

The People's case against defendant rests entirely on the evidence given by the complaining witness, who was within two weeks of her seventh birthday at the time of trial. Her testimony suggests that she was two years and eight months old at the time of the alleged sexual assault.

According to the testimony of Detective Pamela Louis, this incident came to the attention of the Bronx Sex Crimes Unit on February 11, 1989—some two-and-one-half years after it is alleged to have occurred—when her office received a call from an unspecified hospital "that there was a suspicion of abuse." Detective Louis arrived at the hospital where she met the child's maternal grandmother while the child was still undergoing treatment. On cross-examination, Detective Louis stated that she was not aware that defendant was on trial for an incident alleged to have taken place in September 1986 until being so informed by defense counsel. The results of the February 1989 hospital examination and any investigation into the sexual abuse suspected by the hospital as a result of that examination are unknown. In any event, Detective Louis stated that no investigation of any alleged sexual abuse by defendant was undertaken prior to February 1989.

Complainant's maternal grandmother also appeared as a People's witness. The substance of her testimony was that her own infant daughter, Tiasha, was hospitalized with pneumonia in September 1986 when only five months old. On cross-examination she stated that her daughter, Yvette, "had whipped her daughter" (complainant) and, on one occasion, had broken the child's teeth, requiring her hospitalization. As a result of this beating, complainant was removed from her mother's custody and eventually placed in a foster home.

Prior to receiving complainant's testimony, the court conducted a voir dire. At the outset, certain simple questions— such as the child's birthday, where she lived, whether she played marbles—elicited no response. Examination to explore the child's capacity to comprehend the meaning of an oath was conducted almost entirely by the use of leading questions, to which complainant responded with a "yes" or "no" or merely the nod of her head. Complainant initially indicated that the court could not punish her for telling a lie on the witness stand but reversed her position after some verbal coaxing by the Trial Justice.

Much of the complainant's testimony was elicited in the same fashion. The time frame of the assault, which the indictment charges took place "on or about and between September 1, 1986 and September 30, 1986", was suggested by the prosecutor when he asked complainant if she went to anyone's house when Tiasha (her grandmother's infant daughter) had pneumonia. Complainant testified that she went to her paternal grandmother's house (Betheda Mudd) where her father sodomized her in her Uncle Gregory's bedroom. Gregory was not home and her grandmother was at work. She did not remember what defendant was wearing or what she did after the assault, but she told her older brother about it the next day. She only told her grandmother (presumably her maternal grandmother) about it a long time later. She could not explain why she did not tell her grandmother sooner. On direct examination complainant stated that she told no one else about the incident, but on cross-examination she said that she also told her Uncle Gregory and her mother. She could not state when this occurred. Complainant's brother, who was nine years old at the time of trial, was not called as a witness.

Defendant's mother, Betheda Mudd, was the only witness to testify on his behalf. She stated that she learned of the charges against her son when complainant and her mother, Yvette, came to her home. Yvette indicated her belief that defendant had molested complainant. But when asked whether these charges were true, complainant told her grandmother "no", at which point Yvette became angry and stated "I take care of you for having me come over here." The witness subsequently learned that the child was in the hospital and, when she next saw complainant, she was missing her two front teeth.

On summation, the prosecutor told the jury that complainant's mother beat her when she found out what her father had done. The testimony, to the contrary, was that the child was beaten after recanting her accusation against her father.

"A child less than twelve years old may not testify under oath unless the court is satisfied that he understands the nature of an oath" (CPL 60.20 [2]). Prior to swearing the infant complaining witness, the relevant questions asked by the court consisted of leading questions which elicited only perfunctory answers *(People v Ranum,* 122 AD2d 959, 960). The court's inquiry falls far short of the examination conducted in *People v Smith* (104 AD2d 160) which was held to be inadequate to demonstrate that the infant witness was able to understand and appreciate the nature of an oath *(People v*

*Nisoff,* 36 NY2d 560, 565-566). We therefore conclude that permitting complainant to give sworn testimony was a clear abuse of discretion.

Defendant's conviction cannot be sustained. Even conceding, *arguendo,* that complainant possessed sufficient intelligence and capacity to justify receiving her unsworn testimony, defendant may not be convicted solely upon unsworn evidence (CPL 60.20 [3]).

We also note that the capacity of complainant to give truthful and accurate testimony is not supported by the record. Her testimony lacks detail and is completely uncorroborated *(compare, People v Wellman,* 166 AD2d 302, 303, *lv denied* 78 NY2d 958). Nor is there any explanation for the nearly two-and-one-half-year delay in reporting the alleged assault *(compare, People v Collins,* 166 AD2d 270, 271, *lv denied* 76 NY2d 1020). In the absence of expert testimony, any conclusion on the part of the jurors that the delay was not unreasonable under the circumstances must be deemed to arise from "pure speculation or from passion, prejudice or sympathy" *(People v Jackson,* 65 NY2d 265, 271).

Finally, the prosecutor's statement, on summation, that complainant "lost her mother" as the result of the beating she received "when her mother found out" about the assault, is directly contradictory to the evidence, prejudicial and entirely outside the bounds of acceptable rhetorical comment *(see, People v Galloway,* 54 NY2d 396). Concur—Murphy, P. J., Carro, Ellerin, Kassal and Rubin, JJ.