2020 IL App (1st) 163304

SIXTH DIVISION
JUNE 12, 2020

No. 1-16-3304

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 2384 |
| | ) | |
| SAMUEL MILLER, | ) | Honorable |
| | ) | Mauricio Araujo, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1　Following a jury trial in the circuit court of Cook County, the defendant-appellant, Samuel Miller, was convicted of delivery of a controlled substance and sentenced to six years' imprisonment. The defendant now appeals, alleging that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the State made numerous improper remarks during closing arguments; and (3) he was denied his right to counsel during posttrial proceedings. For the following reasons, we affirm the judgment of the circuit court of Cook County but remand the case for a new hearing under *People v. Krankel*, 102 Ill. 2d 181 (1984), with newly appointed counsel.

¶ 2　　　　　　　　　　　　　　BACKGROUND

¶ 3　The State charged the defendant with delivery of a controlled substance. On July 21, 2015, a jury trial commenced, and the following evidence was presented.

¶ 4 Chicago police officer Hamilton[1] testified that she worked as an undercover buy officer for the narcotics division. On January 15, 2015, she drove undercover in a covert police vehicle to the area around 111th Street and Michigan Avenue in Chicago. Her team targeted that area to intercept drug deals.

¶ 5 At 10:53 a.m., Officer Hamilton observed the defendant, whom she identified in court, standing near the corner of 111th Street and Michigan Avenue. She drove up to the defendant, lowered the passenger side window, and yelled out to him. The defendant then walked over to her vehicle and asked her "How many do you want?" Officer Hamilton answered him, and the defendant entered the vehicle, sitting in the rear passenger seat. Officer Hamilton estimated that the defendant was seated less than two feet away from her during their entire interaction.

¶ 6 Inside the vehicle, the defendant handed Officer Hamilton two bags of heroin in exchange for $20 in prerecorded funds. The defendant then exited the vehicle, and Officer Hamilton drove away from the scene. She estimated that the entire transaction lasted less than two minutes. She testified that she focused on the defendant's facial features and clothing during the transaction. After she drove away, Officer Hamilton radioed her team to communicate that there had been a positive transaction. She relayed the defendant's physical description and his last known location.

¶ 7 Shortly afterwards, Officer Hamilton received word from her team that they had detained the defendant. She drove to the location where the other officers had detained the defendant, which she believed was 100 West 111th Street, two blocks away from the location of the undercover buy. She drove by the defendant slowly, at "no more than ten feet away," and positively identified him

---

[1]Officer Hamilton's first name is not in the record on appeal.

as the same individual who had just sold her the heroin. Officer Hamilton then returned to the station and inventoried the heroin.

¶ 8    Chicago police officer Edward Daniels testified that, on January 15, 2015, he worked as a surveillance officer in an undercover operation near the area of 11055 South Michigan Avenue. Officer Daniels explained that about 10 or 12 police officers were involved in the operation that day. His responsibility was to maintain surveillance of the undercover buy from a covert vehicle and relay information to the other team members over the radio.

¶ 9    Officer Daniels was about 30 feet away from the defendant when he saw Officer Hamilton's covert vehicle approach. He saw the defendant enter Officer Hamilton's vehicle for about a minute to a minute and a half. The defendant then exited Officer Hamilton's vehicle but remained at the same location. Officer Daniels continued to surveil the defendant. About a minute after Officer Hamilton drove away, the defendant entered an unknown red vehicle. Officer Daniels could not see what happened inside the red vehicle once the defendant entered it. The defendant remained in the red vehicle for about a minute and then exited it.

¶ 10    Officer Daniels then radioed the enforcement officers with a description of the defendant. Officer Daniels saw the enforcement officers stop the defendant near the location of the undercover buy and later identified him as the same individual who had entered Officer Hamilton's vehicle. Officer Daniels testified that he never lost sight of the defendant from the time he approached Officer Hamilton's vehicle until the enforcement officers detained the defendant.

¶ 11    Chicago police officer Charlie Johnson testified that he participated in the undercover operation on January 15, 2015, as an enforcement officer. Officer Johnson and his two fellow enforcement officers sat in a police vehicle about two blocks east of the buy location. He was able

to monitor the buy over the radio. Eventually, another officer provided Officer Johnson a description by radio regarding a person to be detained. Officer Johnson and his fellow enforcement officers then detained the defendant on 111th Street, although he could not remember the exact location on 111th Street. He testified that his team usually worked on the west side of Chicago and he lacked "extensive knowledge" of the area in which they were working that day. After reviewing the arrest report to refresh his recollection, he testified that he detained the defendant at 100 West 111th Street. Officer Johnson could not recall the individual's description that was provided to him over the radio but testified that there was "no way" he would have stopped the defendant unless he matched the description.

¶ 12    After Officer Hamilton positively identified the defendant as the individual who had sold her the heroin, Officer Johnson arrested and searched the defendant. No drugs were found on the defendant. Officer Johnson did recover $59 cash from him, but they were not the prerecorded funds that Officer Hamilton had used to buy the heroin. Officer Johnson testified: "From my experience, if the target has had contact either with another buyer or seller, sometimes that money is passed off as change or it's given to another person."

¶ 13    On cross-examination, Officer Johnson confirmed that the arrest report indicated the time of arrest was 10:58 a.m. He estimated that he interviewed the defendant for one to three minutes before arresting him.

¶ 14    Martin Palomo, a forensic chemist at the Illinois State Police Forensic Science Center testified that he tested the two bags of heroin that Officer Hamilton had purchased. The results of the test indicated that each bag contained heroin weighing a total of 0.9 grams. On cross-examination, Palomo testified that he did not submit the bags for fingerprint or DNA analysis.

¶ 15    The State rested. The defendant filed a motion for a directed verdict, arguing that there were significant factual discrepancies between the officers' testimony regarding the timeline and location of the arrest. The State responded that such discrepancies "go[ ] to the credibility" of the officers. The trial court agreed, stating that "[i]t's the purview of the jury to determine that." The trial court accordingly denied the motion.

¶ 16    The defendant then rested without testifying or presenting any evidence.

¶ 17    Before the parties began closing arguments, the trial court instructed the jury that "[w]hat the lawyers say during argument is not evidence and should not be considered by you as evidence." The court further told the jury that it would instruct them on the law following closing arguments.

¶ 18    During closing arguments, the State highlighted Officer Hamilton's testimony identifying the defendant as the individual who sold her the heroin. The State also argued that Officer Hamilton's testimony was supported by Officer Daniels, who testified that he saw the defendant enter Officer Hamilton's vehicle. The State said: "We know we have the right guy. We pay our officers to identify people. That is their job."

¶ 19    In response, defense counsel argued that the police officers had "made a mistake" and "arrested the wrong person." Defense counsel focused on the timeline from the officers' testimonies. Specifically, she argued that it was impossible for the defendant to: meet Officer Hamilton at 10:53 a.m., sell her the heroin, conduct another drug deal in the red vehicle, walk a third of a mile, be detained, and then be arrested at 10:58 a.m. Defense counsel claimed that "the time line [*sic*] doesn't add up."

¶ 20    Defense counsel also argued that "Officer Daniels'[ ] testimony just doesn't make any sense" regarding the red vehicle that he saw the defendant enter after Officer Hamilton drove away.

She pointed out that Officer Daniels could not recall the make or model of the red vehicle and did not write down its license plate number. Defense counsel further discredited Officer Daniels' testimony, noting that he testified that the defendant was arrested near the location of the undercover buy, but that "we know that [the defendant] was arrested *** at 111th and Perry, a third of a mile away."

¶ 21    Defense counsel stressed to the jury that the cash recovered from the defendant was not the prerecorded funds that Officer Hamilton had used to make the undercover buy. Defense counsel argued:

> "I anticipate the State is going to tell you that something
> happened in that red vehicle. That's where the money went, where
> the marked money went. Well, I find it pretty difficult to believe that
> this red vehicle ever existed, this red vehicle that they can't describe
> that doesn't fit in the time line [*sic*] from a person who completely
> contradicted the other officer's testimony. It didn't exist. If that
> really happened, why isn't there a license plate? Why isn't there a
> description?"

¶ 22    In rebuttal, the State began:

> "I got two words for you. Baloney. What this—what you just
> heard today is something that makes me think of a mirage. You have
> a magician and comes up with something very ordinary. Look over
> here and look at my assistant. Then some words, then something
> ordinary is extraordinary. Then you look away from that thing.

Don't be distracted from this ordinary drug dealer. That's all he is. *** [Y]ou want to examine these little tricks that they do to catch them. That's where the switch was. I see it. It was a mirror under the table. Something like that."

¶ 23     The State conceded that there was no direct evidence of the red vehicle or what happened inside of it, but nonetheless argued:

"We know that [the red vehicle] existed because Officer Daniels testified to it. I mean if that's—they are trying to say it didn't exist? Really, that's the lie he is going to come in front of you guys with? Couldn't he come up with a better lie? If he is the only one, they could have made up make, model, made up the license plate, whatever. He didn't do that. He told you exactly what happened."

The State claimed that there was enough circumstantial evidence for the jury to infer that the defendant conducted another drug deal inside the red vehicle and that the $20 in prerecorded funds was given as change in that drug deal:

"You heard from Officer Johnson. He's been doing this job a long time. I asked him, [']hey, is it weird that sometimes you stop somebody who receives prerecorded money and he doesn't have that prerecorded money on him any more [*sic*]?['] He said [']no, it's not unusual. Sometimes they will switch it out at a store. They will give it back as change to another drug deal.['] When [the defendant]

went into that red car, you can make an inference what happened in that car and where the money went."

Regarding why the police officers did not follow the red vehicle or write down its license plate number, the State told the jury:

"They want to talk about how come the officers didn't follow that red car? Why didn't they take the driver's license or license plate of the car? Well, they know what happened in the car. It's instinct. It's [a] drug deal. Do [the police officers] want to go after the drug user, somebody with a weakness who this man is exploiting for his own personal gain? Who is more important, the user or the dealer? *** They are going to go after their target which is this man."

¶ 24     The State addressed the defendant's argument concerning the conflicting testimony of the arrest location by arguing:

"[W]hen they asked Officer Johnson to mark the map, remember his response? [']I don't even know which way north is on this.['] This team is from the west side of Chicago. You heard from [Officer] Daniels. They were combined with another team and they were sent to the south side because they are good at what they are doing. They're purchasing drugs. They're not making maps. *** [Officer Hamilton] actually knew the area. Two other officers did not and if you are going to hold that against them, fine. You know

what? Write a letter to Superintendent McCarthy. Mr. Superintendent, we think you should send your police officers through the entire city so they know the streets, but don't use the excuse of them not being familiar with the area to let [the defendant] get away with a free drug deal."

¶ 25 The State also made the following argument regarding the defense's concern about the forensic chemist not testing the plastic bags for fingerprints or DNA:

"[Y]ou heard when the forensic scientist testified, they asked him about fingerprints, DNA. Well, if you are like me, you watch CSI, that's going to be the worst CSI ever. We have ten officers who saw him do this. Great. Let's get the kit out. Let's analyze it. Guess what, they did see it. We know that. They just told you.

This right here is where you received your evidence from. All three officers took the stand and they gave you evidence. You heard from Officer Daniels and you heard from Officer Hamilton because they are the ones that had the best view of what was happening. If you are like my partner, she is more of a big picture girl. She always yells at me that I don't see the forest. I am looking at individual trees. In her view, none of this matters, the car—."

The defendant then objected. The trial court sustained the objection, instructing the State to avoid interjecting its personal opinions. As the State continued with the same line of argument, the defendant again objected. The court overruled that objection, telling the jury: "What the attorneys

say in closing argument is not evidence. The evidence you heard is what came from the stand and those things that were admitted into evidence. They are just making an argument." The State continued and concluded its closing argument:

> "The red car does not matter. Why? He is not charged with any crime involving the red car. The 1505 funds, the prerecorded money, does not matter. Why? Because you will be instructed as to the law. *** Nowhere in that instruction, you will hear it again from the judge, does it mention money. Money is not an element.

> The additional fact—the fact the defendant didn't have additional dope on him does not matter. He is not charged with additional dope. He is only charged with that one delivery to undercover Officer Hamilton.

> * * *

> The fact [of] where the defendant was arrested does not matter. It does not matter where he was arrested. It just doesn't."

¶ 26    The jury then began deliberations. During the deliberations, they sent a note asking the trial court for the arrest report. After discussing it with the parties, the trial court responded to the jury stating: "Police reports are not proper evidence. You have all the evidence. Please continue to deliberate." Approximately an hour later, the jury sent another note to the trial court, indicating that they were at an impasse and asked how they should proceed. The trial court responded with a note telling them to continue to deliberate. The jury later returned a verdict of guilty.

¶ 27    Following the verdict, defense counsel orally moved for judgment notwithstanding the verdict, incorporating the motion for directed verdict and arguing that "no rational trier of fact could have arrived at the conclusion." The trial court denied the motion, but told defense counsel: "You are free to file your motion." Defense counsel then filed a motion for a new trial, as well as a motion to reconsider the denial of her oral motion for judgment notwithstanding the verdict.

¶ 28    Posttrial proceedings commenced. At a hearing on September 23, 2015, the defendant read the following letter aloud to the trial court:

"Your Honor, and this is the truth. I was not given an effective assistance of counsel because my Public Defender first misled me to believe against my better judgment to take a jury trial instead of a bench trial, stating the judge will find me guilty and believe the police without any evidence, which obviously happened anyway.

I was set up by the police, State attorney [*sic*], and my Public Defender, and the jury was influenced by the lies of the State and my attorney's lack of argument.

The only evidence they had, which was drugs, my attorney never challenged the drugs stating, we're not disputing that someone sold the drugs to the officer. We're just saying you didn't sell the drugs, which I didn't.

My lawyer failed to challenge the testing of the drugs to prove that the drugs were even real because the drugs were never

tested. If they were tested, how did the drugs come back weighing the same as when they were weighed at the police station before it was put into evidence?

My lawyer failed to argue the description that the officers gave saying I wore a black jacket when I had a light gray coat and dark jeans.

My lawyer failed to object to the State's closing argument, which he stated my job was to pedal poison to the public to make a profit, when I did not—when I do not and did not sell any drugs to anyone at the time or before my arrest.

I was set up and the system has failed and convicted an innocent man. On these grounds of ineffective assistance of counsel and as well as lack of evidence and the uncorroborated testimonies of the bias [*sic*], surveillance, and arresting officers, I should be given a retrial or given reconsideration."

The trial court stated: "I kind of figured that's where you were going. *Krankel* hearing.[2] Let's do this. I'll give everyone an opportunity to prepare for that." The court then continued the matter to a later date.

¶ 29     On November 23, 2015, the defendant appeared with defense counsel. Defense counsel sought leave to file a supplemental motion to reconsider the denial of the motion for a directed

---

[2]A *Krankel* hearing is required when a defendant who has been convicted brings a claim *pro se*, asserting ineffective assistance of counsel. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 101.

verdict, which the trial court granted. The defendant then expressed to the trial court that he wanted to proceed *pro se*, telling the court that he would "like [his] attorney removed from [the] case" and to file his "own motion for retrial or reconsideration." The trial court responded: "[L]ook, you want to go *pro se*. That's fine. There's a couple of things I need to do before I can do that and it's mostly to advise you of a bunch of stuff." The trial court subsequently asked the defendant: "Are you sure you want to represent yourself?" To which the defendant answered, "Yes." The trial court then granted defense counsel leave to withdraw and allowed the defendant to represent himself.

¶ 30    The trial court asked the defendant if he wanted to proceed on the motions his defense counsel had already filed or if he wanted to file his own motions. The defendant told the court that he wanted to amend the motions already filed by his defense counsel.

¶ 31    The defendant then demanded discovery. When the trial court asked the defendant why he wanted discovery, the defendant explained that he believed there was never a lab report produced from the test that identified the heroin. The trial court reminded the defendant that a forensic chemist had testified and so a lab report would be immaterial. However, the defendant still insisted on receiving a copy of the lab report. He also accused the State, as well as his former defense counsel, of using "false evidence and perjured testimony to obtain a conviction." The following exchange ensued:

> "[THE DEFENDANT]: And I don't want to go, you know, *pro se* but it was b[r]ought to my attention. If [defense counsel] don't [*sic*] raise these things in this motion, on my appeal, they won't raise them and I was railroaded already so I be having to do time for something I didn't do.

THE COURT: Well, now, there's an interesting thing you said in all of that which is you don't want to go *pro se*. Well, you got to make up your mind. All right? You got to make up your mind. What do you want to do? I asked you *** if you want to represent yourself.

[THE DEFENDANT]: I'm not sure I want to represent myself. I want to be represented properly.

THE COURT: No. See, that's something—

[THE DEFENDANT]: Effectively.

THE COURT: Can I ask you something?

[THE DEFENDANT]: All right.

THE COURT: Can I ask you something? I—I don't mean to embarrass you or anything. What's the highest level of education you've obtained?

[THE DEFENDANT]: I got one credit out of high school.

THE COURT: Okay. Well, you understand attorneys go through high school, through college and then law school and then a bar exam at the end of that ***. And then they have to do 15 hours every year of continuing legal education and they get relicensed every year.

Now, like I said, I have no problem [with you] representing yourself. I've seen guys do very good representing themselves. I've

seen guys do very poorly representing themselves. That's a choice you have to make. That's your choice.

[THE DEFENDANT]: I just don't want to be railroaded. I was already found guilty by a jury, and the way [defense counsel] went about it I felt like she really set me up because I didn't do this case. *** And this lawyer, I don't want her to railroad me with this motion. And—and I know I—I mean I can't—I don't want to say I can't do something 'cause I believe I can do anything I put my mind to but I don't know the law. But I know I've been railroaded 'cause I didn't sell no drugs to these police and they got up there and lied and committed perjury and I still got found guilty. And then who's to say if—if she argued this motion just as well as what she did at trial then I'm cooked.

THE COURT: Okay. Well, tell you what. I'll give you 'till mid January to put your motion together."

The trial court then rescheduled the matter to allow the defendant time to obtain the trial transcripts and prepare his *pro se* motions.

¶ 32    On January 13, 2016, the defendant appeared *pro se* and reported that he had not yet received the transcripts. The trial court explained to the defendant that because he was representing himself, he needed to contact the Court Reporter's Office to order the transcripts. The trial court then asked the defendant if he was planning to file his own motions or use the motions his former defense counsel had already filed. The defendant responded that he intended to use "some of it,

but not all" of his defense counsel's motions. The court then granted the defendant additional time to prepare his motions.

¶ 33     On May 2, 2016, the defendant presented his amended motion for a new trial, attaching transcripts and exhibits.

¶ 34     On May 26, 2016, the trial court conducted a *Krankel* hearing where the defendant, still representing himself, made his arguments as to why he received ineffective assistance of counsel. Following the hearing, the trial court concluded that the defendant's claims of ineffective assistance of counsel were meritless. The court then addressed all of the claims in the defendant's motion for a new trial and denied the motion.

¶ 35     The trial court subsequently sentenced the defendant to serve the minimum term of six years' imprisonment, based on his Class X status. This appeal followed.

¶ 36                                ANALYSIS

¶ 37     We note that we have jurisdiction to review the trial court's judgment, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 38     The defendant presents the following three issues: (1) whether the State proved him guilty of delivery of a controlled substance beyond a reasonable doubt; (2) whether the State made improper remarks during closing arguments; and (3) whether the defendant was denied his right to counsel during posttrial proceedings, including the *Krankel* hearing. We take each issue in turn.

¶ 39     The defendant first argues that the State failed to prove him guilty of delivery of a controlled substance beyond a reasonable doubt. Specifically, he claims that the State's "timeline of events at trial was such that no reasonable person could accept that [the defendant] was the person who sold the [heroin] to [Officer Hamilton] five minutes prior to his arrest." He stresses

that, according to the State, he conducted two separate drug deals, walked a third of a mile, and was detained and arrested all within the span of five minutes, which is an "implausible timeline." The defendant further argues that there was no other evidence against him, especially because no drugs or prerecorded funds were found on him. He also points to the conflicting testimony regarding the location of the arrest.

¶ 40    When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. The operative offense in this case is delivery of a controlled substance pursuant to section 401 of the Illinois Controlled Substances Act. 720 ILCS 570/401 (West 2014) ("it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance"). "The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts." *Harris*, 2018 IL 121932, ¶ 26. The reviewing court does not retry the defendant and must draw all reasonable inferences in favor of the State. *Id.* A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt as to the defendant's guilt. *Id.*

¶ 41    In this case, Officers Hamilton and Daniels both testified that the defendant was the individual who sold the heroin to Officer Hamilton. Officer Johnson testified that the defendant matched the description given to him over the police radio. This evidence weighs heavily against the defendant, particularly since Officer Hamilton testified that she focused on the defendant's

facial features and clothing during the transaction and Officer Daniels testified that he *never lost sight of the defendant* between the time of the undercover buy and the time of the arrest.

¶ 42    The defendant makes much of the fact that Officer Daniels testified that the arrest took place near the location of the buy, while the other two officers both struggled to remember the exact location of the arrest but ultimately testified that it occurred at 100 West 111th Street, two blocks away from the buy.[3] However, discrepancies in witness testimony do not automatically render the testimony incredible, and it is for the trier of fact to resolve any conflicts. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 17.

¶ 43    The defendant also makes a point of the fact that no drugs or prerecorded funds were found on him. Significantly though, Officer Daniels testified that the defendant entered a red vehicle after selling heroin to Officer Hamilton, and Officer Johnson explained that sometimes prerecorded funds are lost in subsequent drug deals. It is the responsibility of the trier of fact to resolve evidentiary conflicts and draw reasonable inferences. *Id.* The jury in this case made the reasonable inference that the defendant conducted a second drug deal in the red vehicle and that the $20 in prerecorded funds was exchanged during that second drug deal.

¶ 44    The crux of the defendant's argument is that the State's timeline is "implausible" because he could not have conducted two separate drug deals, walked a third of a mile, and then be detained, interviewed, and arrested all within five minutes. Viewing the evidence in the light most favorable to the State, we disagree that no reasonable person could accept this timeline, especially considering that Officer Daniels testified that each drug deal lasted only about a minute. We note

---

[3]The defendant also references the police report, which indicates the arrest occurred at 100 West 111th Street. However, while police reports may be used for impeachment or refreshing a witness' recollection, it is well settled that police reports are inadmissible evidence. *People v. Williams*, 240 Ill. App. 3d 505, 506 (1992).

that there were other discrepancies that the jury also resolved in the State's favor. We accept these resolutions because they were reasonable and it was the jury's responsibility to weigh the evidence, resolve any conflicts, and draw reasonable inferences. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). The jury having found that the timeline was conceivable and that the defendant was the individual who sold the heroin to Officer Hamilton, we find no basis to disturb its verdict.

¶ 45    Next, the defendant argues that the State made improper remarks during closing arguments. He takes issue with seven different remarks. As the defendant challenges numerous remarks made by the State, we will address each one separately.

¶ 46    The State is afforded wide latitude in closing arguments. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). The State may argue facts and reasonable inferences drawn from the evidence. *People v. Terry*, 312 Ill. App. 3d 984, 993 (2000). In reviewing remarks made during closing arguments, this court asks whether the remarks created a substantial prejudice against the defendant, such that it is impossible to say whether or not a guilty verdict resulted from the remarks. *Wheeler*, 226 Ill. 2d at 123. If the jury could have reached a contrary verdict had the improper remarks not been made, or if this court cannot say that the State's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. *Id.* We review claims of improper remarks made by the State in closing arguments under the abuse of discretion standard. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 54.

¶ 47    The first remark by the State that the defendant alleges was improper is:

> "The red car does not matter. Why? He is not charged with any crime involving the red car. The 1505 funds, the prerecorded money, does not matter. Why? Because you will be instructed as to

the law. *** Nowhere in that instruction, you will hear it again from the judge, does it mention money. Money is not an element.

The additional fact—the fact the defendant didn't have additional dope on him does not matter. He is not charged with additional dope. He is only charged with that one delivery to undercover Officer Hamilton.

* * *

The fact [of] where the defendant was arrested does not matter. It does not matter where he was arrested. It just doesn't."

The defendant claims that this remark made factual determinations for the jury and that the State "inject[ed] its opinion as to which facts matter."

¶ 48    We disagree. The State was responding to defense counsel's arguments that there was no evidence of a red vehicle other than Officer Daniel's testimony and that no drugs or prerecorded funds were found on the defendant. Further, defense counsel raised the question of conflicting testimony regarding the location of the arrest. The State's response to defense counsel's argument regarding the conflicting testimony formed the basis for the defendant's assertion of improper argument. Statements must be considered in the context of closing arguments as a whole, and the State can reasonably respond in rebuttal to the defense's characterizations of the evidence or case. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). This remark by the State did not make factual determinations for the jury. Instead, it argued to the jury that defense counsel's arguments regarding the details of the red vehicle, the lack of drugs and prerecorded funds, and the location of the arrest were irrelevant to finding the defendant guilty of delivery of a controlled substance.

The State also told the jury that the trial court would instruct them as to the law. Accordingly, this remark by the State was not improper.

¶ 49    Regarding the six remaining remarks that the defendant challenges, he concedes that he did not object to them at trial, and so he has not preserved them for appellate review. See *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 16 (to preserve an issue for appeal, a defendant must object at trial and raise the issue in a posttrial motion). Nonetheless, the defendant urges us to review the remarks under the plain error doctrine, which allows this court to bypass normal forfeiture principles and consider an unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Magallanes*, 409 Ill. App. 3d 720, 727-28 (2011). The first step under either prong of the plain error doctrine is to determine whether a clear or obvious error occurred at trial. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 58. We will accordingly determine if any of the six remaining remarks were improper.

¶ 50    The defendant alleges that the State made three separate remarks that each improperly bolstered the officers' credibility based solely on their status as police officers. The operative statements are as follows; and the relevant portions with which the defendant takes issue are emphasized:

> (1) "We know we have the right guy. *We pay our officers to identify*
> *people. That is their job.*"
>
> (2) "You heard from Officer Johnson. *He's been doing this job a*
> *long time*. I asked him, [']hey, is it weird that sometimes you stop
> somebody who receives prerecorded money and he doesn't have

that prerecorded money on him any more [*sic*]?['] He said ['no, it's not unusual. Sometimes they will switch it out at a store. They will give it back as change to another drug deal.['] When [the defendant] went into that red car, you can make an inference what happened in that car and where the money went."

(3) "They want to talk about how come the officers didn't follow that red car? Why didn't they take the driver's license or license plate of the car? Well, they know what happened to the car. *It's instinct.* It's [a] drug deal. Do [the police officers] want to go after the drug user, somebody with a weakness who this man is exploiting for his own personal gain? Who is more important, the user or the dealer? *** They are going to go after their target which is this man."

¶ 51    It is improper for the State to place the weight of a case behind the credibility of the State's witnesses. *Phagan*, 2019 IL App (1st) 153031, ¶ 67. "The hallmark of improper bolstering involves an expression of a prosecutor's personal belief in the credibility of a witness." *Id.* Repeated references to a witness' status as a police officer can amount to improper bolstering. *Id.*

¶ 52    We do not find that any of the three remarks challenged by the defendant amounted to improper bolstering of the officers' testimony because of their status as police officers. Indeed, all three remarks related to the officers' *competence*, not their *credibility*. The remarks referenced the officers' experience as it related to the evidence of the case. This is noteworthy, considering that defense counsel made numerous attacks in characterizing the officers' testimony as untrue or

inaccurate. See *id.* ¶ 71 (in determining whether the State made improper remarks bolstering the credibility of police officers, this court reviews the comment in the context of the entire trial and will consider whether defense counsel invited the remarks). Thus, we find that these remarks were not improper.

¶ 53     The next remark by the State that the defendant challenges is:

> "[Y]ou heard when the forensic scientist testified, they asked him about fingerprints, DNA. Well, if you are like me, you watch CSI, that's going to be the worst CSI ever. *We have ten officers who saw him do this*. Great. Let's get the kit out. Let's analyze it. Guess what, they did see it. We know that. They just told you."

The defendant alleges that this comment presented a fact to the jury that was not elicited during the evidentiary phase of the trial, *i.e.*, that 10 police officers had *seen* the defendant engage in the undercover buy transaction. He points out that Officer Daniels testified that 10 police officers were *involved* in the undercover operation, not that 10 police officers *saw* the buy transaction, and so the State could not tell the jury that ten police officers "saw him do this."

¶ 54     While it is improper for the State to argue nuances of facts not based on the evidence (*Terry*, 312 Ill. App. 3d at 993), this comment was a description of an imaginary CSI episode. It was already used as an illustrative way to explain to the jury that this case was *not* like a CSI episode where forensic evidence would be the determining factor. Notably, the comment was in response to testimony that defense counsel had elicited from the forensic chemist regarding the lack of fingerprint or DNA analysis. Even assuming *arguendo* that the jury misunderstood the metaphor, the trial court strictly and clearly informed the jury that the statements made by the attorneys during

closing arguments were *not evidence*. Reviewing the comment in the context of the entirety of closing arguments, we find that this remark was not improper.

¶ 55    The defendant next claims that the following comment by the State was improper because it characterized the defense as a smokescreen:

> "I got two words for you. Baloney. What this—what you just heard today is something that makes me think of a mirage. You have a magician and comes up with something very ordinary. Look over here and look at my assistant. Then some words, then something ordinary is extraordinary. Then you look away from that thing. Don't be distracted from this ordinary drug dealer. That's all he is. *** [Y]ou want to examine these little tricks that they do to catch them. That's where the switch was. I see it. It was a mirror under the table. Something like that."

¶ 56    In *People v. Kidd*, 147 Ill. 2d 510, 543 (1992), which the defendant heavily relies upon, this court found improper the State's remarks in closing arguments, asserting that the defense strategy was a "smokescreen." We found that the "smokescreen" comment was improper in that case because the circumstances and usage were different. For example, in that case, the State repeated the smokescreen comment *eight* different times. *Id.* at 544. That case involved arson in which 10 children perished, so this court found the "smokescreen" remarks to be particularly inappropriate and inflammatory. *Id.* Here, the State made *only one* comment referencing magic or trickery; and that was done in passing. See *id.* (repeated references to a "smokescreen" were improper where the State did not make just one fleeting, inadvertent, remark regarding the

metaphor). Further, the remark by the State was in response to defense counsel's argument that the red vehicle never existed. See *Evans*, 209 Ill. 2d at 225 (the State can reasonably respond to defense counsel's arguments). Therefore, the remark that the defendant complains of did not exceed the bounds of permissible argument.

¶ 57 The final comment that the defendant challenges is:

> "[W]hen they asked Officer Johnson to mark the map, remember his response? [']I don't even know which way north is on this.['] This team is from the west side of Chicago. You heard from [Officer] Daniels. They were combined with another team and they were sent to the south side because they are good at what they are doing. They're purchasing drugs. They're not making maps. *** [Officer Hamilton] actually knew the area. Two other officers did not and if you are going to hold that against them, fine. You know what? Write a letter to Superintendent McCarthy. Mr. Superintendent, we think you should send your police officers through the entire city so they know the streets, but don't use the excuse of them not being familiar with the area to let [the defendant] get away with a free drug deal."

The defendant claims that this comment disparaged the defense through "unnecessary sarcasm."

¶ 58 Again, the State was clearly arguing in response to defense counsel's criticism that the officers were unclear about the location of the arrest. While the State's remark clearly had a sarcastic tone, and it would have been better had it not been made, we cannot say that this single

remark was so prejudicial that it denied the defendant a fair trial or resulted in his conviction. See *People v. Banks*, 237 Ill. 2d 154, 183 (2010) ("The wide latitude extended to prosecutors during their closing remarks has been held to include some degree of *** sarcasm ***."). Therefore, we are not persuaded by the defendant's argument that this comment was so prejudicial as to warrant reversal.

¶ 59    In sum, it cannot be said that the jury would have reached a contrary verdict had any of the challenged remarks not been made by the State. None of the remarks that the defendant challenges were so prejudicial as to have changed the outcome of the trial. Accordingly, there was no plain error.

¶ 60    Finally, the defendant argues that he was denied his right to counsel when the trial court did not appoint new counsel for him during posttrial proceedings, including for the *Krankel* hearing. His argument is two-fold. He contends that the trial court should not have allowed him to continue *pro se* in the posttrial proceedings after he wavered on his decision to proceed *pro se*. He also argues that, his wavering aside, the trial court should have appointed him new counsel once the court determined that a *Krankel* hearing was necessary.

¶ 61    The sixth amendment to the United States Constitution guarantees an accused in a criminal proceeding the right to assistance of counsel. U.S. Const., amend VI. The right to counsel applies at all critical stages of the criminal proceedings, including posttrial matters. *People v. Vernon*, 396 Ill. App. 3d 145, 153 (2009). The sixth amendment also guarantees the correlative right to proceed without counsel. *Faretta v. California*, 422 U.S. 806, 832-34 (1975); *People v. Wright*, 2017 IL 119561, ¶ 39. Our supreme court has long recognized that the right of a defendant to represent himself is basic and as fundamental as the right to be represented by counsel. *Wright*, 2017 IL

119561, ¶ 39. We review the trial court's determination to allow a defendant to proceed *pro se* for abuse of discretion. *People v. Gray*, 2013 IL App (1st) 101064, ¶ 23.

¶ 62     To be clear, the defendant does not argue that the trial court did not properly admonish him regarding the challenge of proceeding *pro se*, or that his waiver was ambiguous. He concedes that the trial court's admonishment and his waiver were both proper. Instead, he claims that, after he waived his right to counsel, he subsequently equivocated, which voided his waiver. He argues that, during the posttrial proceedings, the trial court should have appointed counsel to represent him again when he said: "I don't want to go, you know, *pro se* *** I'm not sure I want to represent myself. I want to be represented properly."

¶ 63     Once the defendant waived his right to counsel, the trial court properly honored his right to proceed *pro se*, even if the trial court believed it to be a poor decision. While a waiver may end if a defendant alters his position to proceed *pro se* and requests counsel at a later stage in a proceeding (*People v. Cleveland*, 393 Ill. App. 3d 700, 705 (2009)), that did not happen in this case. We note that, more than once, the trial court told the defendant that it was his choice whether to represent himself or not and explained the importance of being represented by counsel. The court also asked the defendant detailed questions regarding his education and ability to represent himself. Nevertheless, the defendant still did not request that the court appoint counsel. He instead merely expressed trepidation about "being railroaded" by his defense counsel.

¶ 64     We acknowledge that the defendant had a right to represent himself in posttrial proceedings and was unequivocal about doing so; nevertheless, our inquiry does not end there. What the defendant ultimately did was represent himself during the *Krankel* hearing, which is a specific posttrial proceeding that has certain safeguards. While it is uncontroverted that a defendant may

waive his right to counsel in posttrial proceedings, as with any waiver, it must be knowingly made. *Wright*, 2017 IL 119561, ¶ 39. It is also well established that once the trial court has determined that a *Krankel* hearing is warranted, as the trial court did in this case, the defendant has an absolute right to the appointment of counsel to represent him in that hearing. *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 40.

¶ 65    The record establishes that it was *never* communicated to the defendant that he had a right to new counsel to represent him during the *Krankel* hearing. Instead, the trial court treated the defendant's desire to represent himself in posttrial proceedings as a desire to represent himself in the *Krankel* hearing, as well. Therefore, the court never informed the defendant of his right to have counsel appointed specifically to represent him in the *Krankel* hearing. See *People v. Boose*, 2014 IL App (2d) 130810, ¶ 35 (once the trial court determines, following a preliminary hearing, that the defendant might have a valid claim of ineffective assistance of counsel, the defendant has a right to new counsel to represent him during the *Krankel* hearing). This is especially noteworthy, since the record suggests that, while the defendant was unequivocal about his desire to represent himself in posttrial proceedings, his motivation to go *pro se* was specifically directed at his defense counsel. There is an inescapable inference that, had the defendant been given the information and opportunity to be represented by new counsel for the *Krankel* hearing, he would have opted for such representation. Unfortunately, he was never given the information or the option. This deprived the defendant of an important right and was therefore an abuse of discretion resulting in error.

¶ 66                            CONCLUSION

¶ 67    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County but

remand the case for a new *Krankel* hearing. On remand, we direct the trial court to appoint new counsel to represent the defendant on his ineffective assistance of counsel claim.

¶ 68    Affirmed in part and remanded in part.

**No. 1-16-3304**

| | |
|---|---|
| **Cite as:** | *People v. Samuel Miller* 2020 IL App (1st) 163304 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-2384; the Hon. Mauricio Araujo, Judge Presiding. |
| **Attorneys for Appellant:** | James E. Chadd, State Appellate Defender, Office of the Appellate Defender, 203 N. LaSalle Street, 24th Floor, Chicago, Illinois 60601, (Patricia Myska, Deputy Defender, Linda Olthoff, Supervisor), counsel for APPELLANT. |
| **Attorneys for Appellee:** | Kimberly Foxx, State's Attorney of Cook County, Richard J. Daley Center, 3rd Floor, Chicago, Illinois 60602, (Alan J. Spellberg, Brian K. Hodes, David B. Greenspan, of counsel) for APPELLEE. |